MCKOOL SMITH HENNIGAN, P.C.
RODERICK G. DORMAN (SBN 96908)
rdorman@mckoolsmithhennigan.com
ROBERT E. ALLEN (SBN 166589)
rallen@mckoolsmithhennigan.com
LAWRENCE M. HADLEY (SBN 157728)
lhadley@mckoolsmithhennigan.com
ALAN P. BLOCK (SBN 143783)
ablock@mckoolsmithhennigan.com
300 South Grand Avenue, Suite 2900
Los Angeles, CA 90071
T:  (213) 694-1200; F:  (213) 694-1234

MILLER LAW LLC
MARVIN A. MILLER (admitted pro hac vice)
mmiller@millerlawllc.com
ANDREW SZOT (admitted pro hac vice)
aszot@millerlawllc.com
KATHLEEN E. BOYCHUCK (admitted pro hac vice)
kboychuck@millerlawllc.com
115 S. LaSalle Street, Suite 2910
Chicago, IL 60603
T:  (312) 332-3400; F:  (312) 676-2676

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ABS ENTERTAINMENT, INC., an Arkansas corporation, BARNABY RECORDS, INC., a California corporation, BRUNSWICK RECORD CORPORATION, a New York corporation and MALACO, INC., a Mississippi corporation, each individually and on behalf of all others similarly situated. <br><br> Plaintiffs, <br><br> v. <br><br> CBS CORPORATION, a Delaware corporation; CBS RADIO INC., a Delaware corporation; and DOES 1 through 10, <br><br> Defendants. | Case No. 2:15-cv-6257 PA (AGRx) <br><br> **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT** <br><br> Date:   May 2, 2016 <br> Time:   1:30 p.m. <br> Place:   Courtroom 15 – Spring St. <br> Before:  Hon. Percy Anderson |

## TABLE OF CONTENTS

I.    INTRODUCTION .................................................................1

II.   STATEMENT OF FACTS ....................................................3

      A.    Plaintiffs Own Pre-1972 Sound Recordings .......................3

      B.    CBS Publicly Performed Remastered Copies of Plaintiffs' Pre-1972 Sound Recordings .................................................7

      C.    CBS Lacked Authorization or the Legal Right to Broadcast or Stream Copies of Plaintiffs' Pre-1972 Sound Recordings.....................8

III.  CBS IS NOT ENTITLED TO SUMMARY JUDGMENT ............................9

      A.    Substantial Evidence Confirms that CBS Played Plaintiffs' Sound Recordings...............................................9

            1.    *CBS Does Not Dispute That It Played 57 Of Plaintiffs' Remastered Sound Recordings* ..............................10

            2.    *Triable Issues Of Fact Exist As To CBS's Public Performance Of Plaintiffs' Other Sound Recordings* ...............12

      B.    CBS Is Liable For "Making Available" Plaintiffs' Sound Recordings..................................................13

      C.    The Remastered Copies That CBS Performed Are Pre-1972 Sound Recordings Governed Under California, Not Federal, Law ...............16

            1.    *Remastering Pre-1972 Sound Recordings Does Not Convert Them Into Post-1972 Sound Recordings* ...................17

            2.    *CBS Performed Plaintiffs' Remastered pre-1972 Sound Recordings, Not New Post-1972 Sound Recordings* .............21

IV.   CONCLUSION. ............................................................25

McKool Smith Hennigan, P.C.
Los Angeles, CA

1170914

OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A&M Records, Inc. v. Napster, Inc.*,
239 F.3d 1004 (9th Cir. 2001) ................................................................ 14

*Agee v. Paramount Communs.*,
853 F. Supp. 778 (S.D.N.Y. 1994), *aff'd in part on other grounds,
rev'd in part on other grounds*, 59 F.3d 317 (2d Cir. 1995) ..................... 19

*Arista Records, Inc v. MP3Board, Inc.*,
2002 U.S. Dist. LEXIS 16165 (S.D.N.Y. Aug. 29, 2002) ......................... 16

*Atl. Recording Corp. v. Anderson*,
2008 U.S. Dist. LEXIS 53654 (S.D. Tx. Mar. 12, 2008) ......................... 15

*Capitol Records, Inc. v. Naxos of Am., Inc.*,
262 F. Supp. 2d 204 (S.D.N.Y. 2003) ..................................................... 17

*Capitol Records, Inc. v. Naxos of Am., Inc.*,
372 F.3d 471 (2d Cir. 2004) ................................................................... 18

*Capitol Records, Inc. v. Naxos of Am., Inc.*,
4 N.Y.3d 540 (2005) ......................................................................... 17, 18

*Capitol Records, LLC v. Seydou Kouyate*,
2008 U.S. Dist. LEXIS 118536 (N.D. Ind. June 19, 2008) ....................... 15

*Durham Indus., Inc v Tomy Corp.*,
630 F.2d 905 (2d Cir 1980) ................................................. 18, 23, 24, 25

*Elohim EPF USA, Inc. v. Total Music Connection, Inc.*,
No. 14-CV-02496-BRO, ECF. No. 197 (C.D. Cal. Oct. 1, 2015) ............... 15

*Entm't Research Grp., Inc. v. Genesis Creative Grp., Inc.*,
122 F.3d 1211 (9th Cir. 1997) ................................................................ 18

*Ets-Hokin v. Skyy Spirits Inc.*,
225 F.3d 1068 (9th Cir. 2000) ................................................................ 23

*Gilliam v. American Broadcasting Cos.*,
538 F.2d 14 (2d Cir. 1976) ..................................................................... 25

McKool Smith Hennigan, P.C.
Los Angeles, CA

ii

*Gracen v. Bradford Exchange*,
  698 F.2d 300 (7th Cir. 1983) ................................................................... 23

*Hotaling v. Church of Jesus Christ of Latter-Day Saints*,
  118 F.3d 199 (4th Cir. 1997) ................................................................... 14

*L. Batlin & Son, Inc. v. Snyder*,
  536 F.2d 486 (2d Cir. 1976) .............................................................. 18, 24

*Maljack Productions v. UAV Corp.*,
  964 F. Supp. 1416 (C.D. Cal. 1997) ............................................ 19, 20, 21

*McCormick v. Cohn*,
  1992 U.S. Dist. LEXIS 21187 (S.D. Cal. July 31, 1992) .......................... 23

*N.Y. Times Co. v. Tasini*,
  533 U.S. 483 (2001) ................................................................................ 18

*Perfect 10, Inc. v. Amazon.com, Inc.*,
  508 F.3d 1146 (9th Cir. 2007) ................................................................. 14

*Perfect 10, Inc. v. Rapidshare A.G.*,
  2010 U.S. Dist. LEXIS 146053 (S.D. Cal. May 18, 2010) ........................ 14

*Pryor v. Jean*,
  2014 U.S. Dist. LEXIS 143515 (C.D. Cal. Oct. 8, 2014) ................... 20, 21

*Pryor v. Jean*,
  No. 13-cv-02867-DDP (C.D. Cal. Dec. 13, 2013), ECF No. 36 ............... 20

*Stewart v. Abend*,
  495 U.S. 207 (1990) ................................................................................ 25

*TIMPCO, LLC v. Implementation Servs., LLC*,
  2010 U.S. Dist. LEXIS 103668 (S.D. Ind. Sep. 29, 2010) ....................... 15

*U.S. Auto Parts Network, Inc. v. Parts Geek, LLC*,
  692 F.3d 1009 (9th Cir. 2012) ................................................................. 24

*UMG Recordings, Inc. v. Alburger*,
  2009 U.S. Dist. LEXIS 91585 (E.D. Penn. Sep. 30, 2009) ...................... 15

*United States v. Taxe*,
  380 F. Supp. 1010 (C.D. Cal. 1974) ................................................. 19, 21

McKool Smith Hennigan, P.C.
Los Angeles, CA

1170914

*Wood v. Bourne Co.*,
   60 F.3d 978 (2d Cir. 1995) ............................................................... 23

**Statutes**

17 U.S.C.
   § 103(a) ............................................................................................ 24
   § 103(b) ............................................................................................ 24
   § 106(2) ............................................................................................ 24
   § 106(3) ............................................................................................ 14
   § 301(c) ................................................................................... 5, 21, 23
   § 302(a) ............................................................................................ 21

Cal. Civil Code
   § 980(a)(2) .................................................................................... 3, 16

Copyright Act ..................................................................................... 23, 24

Sound Recording Act of 1971, Pub. L. No. 92-140, 85 Stat. 391,
   § 3 (1971) .......................................................................................... 5

**Other Authorities**

Copyright Office, Library of Congress, Circular No. 56,
   *Copyright Registration of Sound Recordings* (2014) ......................... 8, 19

1-3 Melville B. Nimmer & David Nimmer,
   *Nimmer on Copyright*, § 3.01 ............................................................. 23

McKool Smith Hennigan, P.C.
Los Angeles, CA

1170914

## I.   __INTRODUCTION__

The "narrow factual question" that CBS raises in its motion—whether CBS played Plaintiffs' pre-1972 sound recordings—is an unequivocal "yes."  CBS publicly performed Plaintiffs' pre-1972 sound recordings, without Plaintiffs' consent, over its terrestrial radio stations and through its "Radio.com" website.  Those sound recordings capture performances that took place prior to February 15, 1972, for which there is no federal copyright protection as derivative works or otherwise.  Although CBS played copies of Plaintiffs' sound recordings—which were "remastered" from the original analog format into digital formats and placed on compact disc ("CD") albums—those remastered copies are **also** not protected under federal copyright law as derivative works or otherwise.  Indeed, the undisputed facts show that no one has ever claimed a federal copyright for the remastered copies of Plaintiffs' pre-1972 works at issue in this case.

It is not just that federal law precludes new copyrights for the remastered copies that CBS played; contract law precluded the creation of new works that would have been copyrightable.  The licenses authorizing the reproduction and distribution of Plaintiffs' original pre-1972 analog master recordings in digital formats did not authorize any creative modifications that could have been separately copyrighted under federal law.  Paul Geluso, a Master Teacher of Music Technology at NYU and recognized expert in sound recording, examined Plaintiffs' pre-1972 recordings, compared them with the audio files that CBS broadcast, and confirmed that no such modifications were made.  After performing his analysis, Mr. Geluso concluded that in 202 of the 219 songs compared, the sound recording in CBS's audio file copy captured the identical pre-1972 performance in Plaintiffs' original master recording.  Mr. Geluso further concluded that, of the 202 sound files that contain the identical performances:

- None of the sound recordings contain any re-mixing of Plaintiffs' original sound recordings.

1

- None of the sound recordings contain any editing of Plaintiffs' original sound recordings.
- None of the sound recordings contain added sounds or had sounds that were deleted.
- The sound recordings in the CBS sound files embody the original master sound recordings owned by the Plaintiffs.

Declaration of Paul Geluso, ¶¶ 10-11.

CBS relies on irrelevant declarations from Dr. Begault and Mr. Inglot. Dr. Begault performed four "tests" (applying his self-created pass/fail standards never before used in a copyright analysis) to conclude that the remastered audio files CBS played are not "identical" duplicates of Plaintiffs' original master recordings. CBS did not need an expert or any tests to say that. Remastering from an analog to digital format alone necessarily results in processing changes to a sound recording, but does not make the remastered copy a new creative work subject to a separate federal copyright. Mr. Inglot testified that he remastered some of Plaintiffs' pre-1972 sound recordings from analog to digital format and, as part of the remastering, made mechanical processing adjustments to the recorded sounds—just like one may adjust bass and treble using stereo knobs. Even if CBS played sound recordings remastered by Mr. Inglot—and CBS offers no evidence that it did—this too lacks any relevance. Dr. Begault admittedly found no such changes in CBS's copies and Mr. Inglot testified that he did not remix, edit, add sounds to, or delete sounds from any of Plaintiffs' pre-72 sound recordings.

Federal law does not treat remastered sound recordings as separate copyrightable works, particularly when only mechanical processing adjustments are made to optimize the recording for a particular technological format. Without (at the very least) remixing, editing, adding sounds to, or deleting sounds from the original recording, federal law does not recognize the remaster as a newly protectable work. The evidence shows that, at most, the remastered copies of Plaintiffs' pre-1972 sound

McKool Smith Hennigan, P.C.
Los Angeles, CA

recordings publicly performed by CBS were simply converted from analog to digital format and contain only mechanical processing without any remixing, editing, additions of sounds or deletions of sounds. Thus, the remastered sound recordings in CBS's possession not only lack federal copyrights, they are ineligible for federal copyright protection, and are only protected under Cal. Civil Code § 980(a)(2).

Finally, there is no dispute that CBS publicly performed (or at least made available) a substantial number of Plaintiffs' sound recordings in California. As to many other sound recordings belonging to Plaintiffs, material facts regarding CBS's performance in California remain disputed. Under these facts and the law, CBS's motion must be denied.

## II.   STATEMENT OF FACTS

### A.   Plaintiffs Own Pre-1972 Sound Recordings

Plaintiffs ABS Entertainment, Inc., Barnaby Records, Inc., Brunswick Record Corporation and Malaco, Inc. own sound recordings of musical performances that initially were fixed (*i.e*., recorded) prior to February 15, 1972 ("pre-1972 sound recordings"). (*See* ECF 48 at 5-7 and 21-31; Wilson (ABS) Decl. ¶ 2; Kartiganer (Barnaby) Decl. ¶ 2; Tarnopol Decl. (Brunswick) ¶ 2; Couch (Malaco) Decl. ¶ 2.) These sound recordings capture the original studio performances by, among other artists, Al Green, Andy Williams, the Chi-Lites, Jackie Wilson, Ray Stevens, the Everly Brothers, the Chordettes and King Floyd. (*Id.*) For decades, Plaintiffs have been engaged in the business of distributing, selling and licensing the reproduction, distribution, sale and performance of sound recordings for use in (among other things) albums, CDs, audiovisual works, and for streaming and downloading over the Internet (Wilson Decl. ¶ 5; Kartiganer Decl. ¶ 5; Tarnopol Decl. ¶ 5; Couch Decl. ¶ 5.)

Plaintiffs' pre-1972 recordings, recorded in the analog format—the digital format did not exist at the time— are the final mixed sound recordings of an artist's performance (commonly referred to as the "master recordings"). (Wilson Decl. ¶ 3; Kartiganer Decl. ¶ 3; Tarnopol Decl. ¶ 3; Couch Decl. ¶ 3). Plaintiffs (or their

McKool Smith Hennigan, P.C.
Los Angeles, CA

1   predecessors) then applied the "mastering process" to each of the pre-1972 recordings

2   to create a copy optimized for the vinyl record format—sometimes referred to as the

3   "duplication master." (*Id.*)  The duplication master and the master recording are

4   identical in that both embody the identical performance and final mix of the musical

5   artist, as originally fixed.  (*Id.*)

6        Plaintiffs had similar copies made from the master recording to serve as the

7   duplication master for other formats, including analog cassette tapes and 8-track tapes

8   (applying the "mastering process" again, sometimes referred to as "remastering") in

9   order to optimize the pre-1972 sound recording for the applicable format.  (Wilson

10  Decl. ¶ 4; Kartiganer Decl. ¶ 4; Tarnopol Decl. ¶ 4; Couch Decl. ¶ 4.)  With the

11  advent of digital recording, Plaintiffs created a digital transfer copy of each of the pre-

12  1972 recordings.  (*Id.*)  Although advancements in recording technology allowed for

13  mechanical processing adjustments to optimize the recording for the new formats, the

14  remastering of Plaintiffs' sound recordings did not include remixing, editing,

15  resequencing, adding new sound or removing sounds.  (Geluso Decl. ¶¶ 10, 25.)

16  Thus, the "remastered" sound recordings remained identical to the originally mastered

17  recording in that the actual sounds of the artist's performances fixed in the originally

18  mastered recording are the same as the actual sounds of the artist's performances fixed

19  in the remastered recording—with  only mechanical adjustments made to optimize the

20  sound in the new format.   (Geluso Decl. ¶ 25.)

21       For some pre-1972 sound recordings, Plaintiffs granted licenses allowing for

22  the distribution of the recordings, including distribution as part of "compilation

23  albums" with other sound recordings.  (Wilson Decl. ¶ 6; Kartiganer Decl. ¶ 6;

24  Tarnopol Decl. ¶ 6; Couch Decl. ¶ 6.)  Such licenses, however, only allowed the

25  licensee to reproduce and distribute Plaintiffs' recordings and not to create a

26  derivative work or to make any substantial, non-trivial changes to the sound of these

27  recordings.  (Wilson Decl. ¶ 6, 12; Kartiganer Decl. ¶ 6, 12; Tarnopol Decl.¶ 6, 12;

28  Couch Decl. ¶ 6, 12.)  For example, Plaintiffs licensed sound recordings to Rhino

Entertainment Company ("Rhino") for distribution, which, in some cases, Rhino may have remastered them for its compilation albums in digital formats, including CD.[1] As explained by Robert Emmer, Rhino's then Executive Vice President and Head of Business and Legal Affairs, Rhino was never authorized to create, nor claimed to have created, a derivative work from any of Plaintiffs' pre-1972 sound recordings.[2] (Emmer Decl. ¶ 5.)  Thus, Rhino never claimed any ownership or copyright interest in any of the remastered recordings of Plaintiffs' works.[3]  (*Id.* at ¶¶ 5-7.)

Plaintiffs retained all right, title and interest in the ownership of their respective pre-1972 sound recordings.  These ownership rights extend to all remastered

---

[1] In his declaration accompanying CBS's motion, William Inglot testifies that he did remastering for Rhino with respect to some of Plaintiffs' pre-1972 sound recordings.  (*See* Declaration of William Inglot, at ¶¶ 35-59.)  But Mr. Inglot does not know whether any of Plaintiffs' pre-1972 sound recordings that were remastered by him were the copies that CBS played over the air or through Internet streaming. (Inglot Dep., 32:4-12; Ex. 8 (all Deposition Exhibits are attached to the Block Declaration unless noted otherwise).)

[2] In 1971, Congress amended the copyright act to include protection for sound recordings "fixed, published, and copyrighted or and after [February 15, 1972]." Sound Recording Act of 1971, Pub. L. No. 92-140, 85 Stat. 391, § 3 (1971).  Sound recordings fixed prior to February 15, 1972 remained protected under state law.  *See* 17 U.S.C. § 301(c).

[3] Likewise, Mr. Inglot testified that he never claimed a federal copyright for any remastering work he did.  (Inglot Dep., 30:16-31:5; Ex. 8)  Mr. Inglot also testified that, in remastering Plaintiffs' pre-1972 sound recordings, he never did any remixing, editing, resequencing, or adding sounds or deleting sounds.  (Inglot Dep., 55:3-14; 56:18-57:13, 77:23-78:20; Ex. 8)  Nor does Mr. Inglot dispute Plaintiffs' ownership claims in the sound recordings at issue.  (Inglot Dep., 46:12-14; Ex. 8)  In fact, Mr. Inglot readily admits that he used the sounds of Plaintiffs' original master recordings in the remasters.  (Inglot Dep., 57:25-58:12.)  While Mr. Inglot declared that he made "significant and noticeable alternations and modifications" in the remastering process, (Inglot Decl. ¶ 34), he admitted that he could not recall any specific change to a particular recording (Inglot Dep., 98:18-99:6; Ex. 8) and that his alternations and modifications amounted to nothing more than "doing a good job" according to his subjective determination.  (Inglot Dep., 103:12-23; Ex. 8.)

McKool Smith Hennigan, P.C.
Los Angeles, CA

1170914

recordings distributed under license, whether by Rhino or others, and regardless of the format onto which the recordings were remastered or the medium on which they were stored.  (Wilson Decl. ¶¶ 6, 9-12; Kartiganer Decl. ¶¶ 6, 9-12; Tarnopol Decl. ¶¶ 6, 9-12; Couch Decl. ¶¶ 6, 9-12.)

CBS does not offer any admissible evidence that any other entity claims ownership in a remastered copy of Plaintiffs' pre-1972 sound recordings.  To make up for the lack of evidence, CBS offered declarations from two employees—Seth Neiman and Jeff Sottolano—for facts those witnesses subsequently admitted they knew nothing about.  In sworn declarations written by CBS attorneys, these witnesses testified that various entities claimed post-1972 "sound recording copyrights" in the remasters of Plaintiffs' pre-1972 sound recordings.  (*See* Neiman Decl. ¶ 13 ("In many cases the liner notes show that a separate copyright registration is being claimed for the new sound recordings well after 1972") and ¶¶ 14-63; Sottolano Decl. ¶ 10 (same) and ¶¶ 11-28.)  Yet, when confronted at deposition with the actual copyright registrations for the CD compilation album (which show copyrights in the artwork, liner notes and for the compilation album itself, *but not any copyrights in the included sound recordings that are the subject of this action*),[4] both witnesses were forced to admit that they, in fact, had no knowledge as to whether "sound recording copyrights" were claimed in any of the remastered copies of the works.  (Neiman Dep., at 144:13-146:3; 158:5-160:16; Ex. 4; Sottolano Dep., at 99:20-110:2; Ex. 5.)  Worse, both declarants were unfamiliar with copyright notices in general and conceded that they never reviewed the actual copyright registrations for the CD compilation album at issue before signing their declarations.  (*Id*).  More troubling, neither Messrs. Neiman nor Sottolano could explain why they testified under penalty of perjury that "sound recording copyrights" existed in the remastered works when each admitted he  had no

---

[4] Exemplary copyright registrations for the CD liner notes cited in the Neiman and Sottolano declaration are attached as Exhibit 10 to the Block Decl.

McKool Smith Hennigan, P.C.
Los Angeles, CA

McKool Smith Hennigan, P.C.
Los Angeles, CA

1    information on which to base that sworn testimony.   (Neiman Dep., at 153:3-158:4;

2    Sottolano Dep., at 100:3-109:8; Ex. 5.)

3        **B.    CBS Publicly Performed Remastered Copies of Plaintiffs' Pre-1972**

4            **Sound Recordings**

5        In the First Amended Complaint, Plaintiffs collectively identified 174

6    exemplary pre-1972 sound recordings owned by them, which they contend CBS

7    publicly performed without consent.  (*See* ECF 48, at 21-31.)  Plaintiffs contend that

8    CBS publicly performed these recordings in two ways:

9        *First*, CBS digitally streamed Plaintiffs' sound recordings over the Internet

10    from the CBS-owned website, Radio.com.  CBS streams sound recordings on

11    Radio.com from two sources through servers maintained in New York City (Neiman

12    Dep., at 18:14-19:4; Ex. 4; Response to Interrogatory No. 4; Ex. 13.):  One source

13    originates from CBS's own "exclusive," Internet-only stations—which CBS creates

14    and programs for Internet streaming.  (Neiman Dep., at 25:16-25; Ex. 4.)  The other

15    source originates from "simulcasts" of CBS terrestrial radio AM, FM and HD radio

16    broadcast stations located in the United States.  Through the Radio.com website, a

17    user can listen to simulcasts of all 80 CBS-owned music radio stations from anywhere

18    in the United States.  (Neiman Dep., at 25:19-27:9, 76:5-24; Ex. 4.)  Every song that

19    CBS broadcasts from any CBS-owned radio station in the United States, as well as

20    every song played over CBS's "exclusive" Internet radio stations, are streamed from

21    New York, and can be accessed anywhere in the United States through a web browser

22    or smart phone application.

23        *Second*, CBS broadcasts Plaintiffs' pre-1972 recordings over terrestrial

24    airwaves from CBS-owned radio stations in California and elsewhere by traditional

25    AM and FM signals and by HD signals on HD Multicast stations.  (Sottolano Decl. ¶

26    2).

27        CBS admits that it broadcast or streamed at least 57 sound recordings that

28    Plaintiffs' claim to own.  Substantial evidence shows that CBS broadcast or streamed

1170914

1   significantly more.  CBS's records of the sound recordings it publicly performed

2   demonstrate that it performed at least 100 of Plaintiffs' pre-1972 sound recordings

3   during the period commencing four years prior to this litigation. (Block Decl. ¶¶ 5-

4   23.)

5       **C.    CBS Lacked Authorization or the Legal Right to Broadcast or**

6           **Stream Copies of Plaintiffs' Pre-1972 Sound Recordings**

7       CBS does not contend that Plaintiffs (or anyone else) licensed or authorized it

8   to publicly perform the remastered copies of Plaintiffs' pre-1972 sound recordings.

9   Rather, CBS's motion is premised on the assertion that the copies of Plaintiffs' sound

10  recordings that CBS used to broadcast or stream is covered by federal copyright law,

11  not state law.

12      CBS's assertion is wrong.  Under the facts and law, federal copyright law does

13  not cover the remastered copies of Plaintiffs' pre-1972 sound recordings.  CBS's self-

14  styled "threshold issue" has no legal relevance:  Contrary to CBS's issue, application

15  of federal copyright law does not turn on "whether any 'remastered' or 'reissued'

16  recording is *identical* to the original pre-1972 recordings plaintiffs claim to own"—

17  and Plaintiffs never "acknowledged" so.  (Mot. at 7 (emphasis added).)  Converting

18  sound recordings from one format into another, along with mechanical sound

19  adjustment to optimize the copy for the new format, does not create a new derivative

20  work protectable under copyright law.  Indeed, the U.S. Copyright Office's Circular

21  No. 56—the same publication CBS relies on[5]—expressly states that the "preexisting

22  recorded sounds must have been rearranged, remixed, or otherwise altered in sequence

23  or character, or there must be some additional new sounds" before a new, derivative

24  work copyright will attach.  If the law were otherwise, the owner of a sound recording

25

26      [5] Mot at 5 (citing U.S. Copyright Office, Library of Congress, Circular No. 56,

27  *Copyright Registration of Sound Recordings* (2014) at 3 (attached as Ex. 4 to Strabone

28  Decl.))

McKool Smith Hennigan, P.C.
Los Angeles, CA

1170914

1  could extend copyright protection indefinitely by continuing to remaster a work into

2  new formats.

3  CBS admits that remastered pre-1972 sound recordings are not subject to

4  federal copyright protection where the remastering process is "merely mechanical."

5  (Mot. at 5.)  Yet, to the extent that CBS publicly performed remastered copies of

6  Plaintiffs' pre-1972 sound recordings, such remastered copies were simply digital

7  conversions optimized for the digital formats using only mechanical processing.  CBS

8  does not offer any evidence that any of the remastered copies of Plaintiffs' pre-1972

9  sound recordings in its possession have been remixed, edited, re-arranged, altered or

10  modified with new sounds.  Thus, the remastered copies are not subject to federal

11  copyright protection.

12  **III.   CBS IS NOT ENTITLED TO SUMMARY JUDGMENT**

13  CBS does not dispute that Plaintiffs own the sound recordings of performances

14  identified in Schedules A1-A4 of the First Amended Complaint.  Nor does CBS

15  dispute that it maintains at least 57 of those sound recordings on its servers and has

16  broadcast or streamed those recordings.  CBS's sole defense—that it broadcast and

17  streamed "remastered" copies of Plaintiffs' sound recordings in a digital format rather

18  than the "identical" pre-1972 recording in the original vinyl format—does not excuse

19  its unlawful exploitation. CBS's copies of the performances are still pre-1972 sound

20  recordings—regardless of the conversion from the analog to digital and regardless of

21  mechanical remastering process to optimize the sound for that digital medium.

22  **A.   Substantial Evidence Confirms that CBS Played Plaintiffs' Sound**

23  **Recordings**

24  CBS contends that it is entitled to summary judgment because "plaintiffs have

25  no basis for claiming that CBS publicly performed [the vast majority of the songs that

26  plaintiffs have put at issue in this case]."  (Mot. at 7.)  Not true.  Substantial evidence

27  exists, proving by a preponderance of the evidence (or at least creating a genuine issue

28  of material fact) that CBS publicly performed at least 57 of Plaintiffs' pre-1972 sound

McKool Smith Hennigan, P.C.
Los Angeles, CA

9

McKool Smith Hennigan, P.C.
Los Angeles, CA

1  recordings either over the Internet on CBS's Radio.com website (via streaming

2  Internet-only stations or simulcasts of CBS's U.S. terrestrial radio stations) and over

3  the airwaves on CBS's terrestrial radio stations (FM, AM, and HD Multicast) during

4  the four years prior to Plaintiffs filing this lawsuit.

5      ### 1.    *CBS Does Not Dispute That It Played 57 Of Plaintiffs'*

6              *Remastered Sound Recordings*

7      CBS does not dispute that it publicly performed at least 57 remastered copies of

8  Plaintiffs' pre-1972 sound recordings during the relevant time period over the Internet

9  on Radio.com and terrestrial radio broadcasts.

10     In response to a request that CBS identify which of the pre-1972 sound

11 recordings identified in Schedules A1-A4 of Plaintiffs' First Amended Complaint that

12 CBS publicly performed during the past four years, CBS's counsel stated that, based

13 on their review of "the records produced," "we believe that there are 57 songs that

14 may have been played by CBS."  (Email from A. Gressel of January 7, 2016; Block

15 Decl. ¶ 4; Ex. 2 to Block Decl.)  CBS provided Plaintiffs with lists identifying those

16 57 songs.  (*Id.*)  In January 2016, when CBS provided this information, it had only

17 produced Mediabase records (Mediabase is a third party service that monitors

18 recordings performed by radio stations), identifying songs CBS publicly performed on

19 its terrestrial radio stations in New York and California and produced records

20 identifying the recordings publicly performed on Radio.com's Internet stations and/or

21 stored on Radio.com's database of recordings for the Internet stations.  (Block Decl. ¶

22 4).  CBS had not produced reports identifying all of the recordings that were simulcast

23 over Radio.com.  (*Id.*)

24     CBS's admission that there are 57 recordings that "may have been played by

25 CBS" is, at the very least, sufficient to create a genuine issue of material fact that CBS

26 publicly performed these 57 pre-1972 sound recordings in California during the

27 relevant time period.   These facts preclude summary judgment as to these 57 sound

28 recordings.

1170914

Other facts provided by CBS **with its motion** prove that CBS publicly performed 60 of Plaintiffs' sound recordings on Radio.com's exclusive Internet stations and on terrestrial radio broadcasts. (Block Decl. ¶¶ 5-17). With respect to its Internet stations, CBS's Director of Digital Audio, Seth Neiman, testified that every recording that is played on Radio.com's exclusive streaming stations is tracked on CBS's digital library system called Radio 2.0, and that CBS runs reports to collect this information for reporting to SoundExchange for royalty payment purposes, as CBS is legally required to do for post-1972 sound recordings. (Neiman Dep., at 13:14-19:24; Ex. 4.) In his declaration, Mr. Neiman describes how CBS's employees reviewed those records to determine which of the recordings listed on Plaintiffs' Schedules A1-A4 were publicly performed on Radio.com (on the exclusive stations only) in the four years prior to the filing of the complaint (Neiman Decl. ¶ 7). CBS's review determined that there is no record of CBS publicly performing 114 (of the 174) of Plaintiffs' recordings (Neiman Decl. ¶¶ 8-11), which means that there are records produced by CBS showing that it publicly performed 60 of Plaintiffs' recordings on CBS's exclusive Internet stations during the four years prior to the filing of the complaint. (Neiman Decl. ¶ 12; Block Decl. ¶¶ 5-11). As discussed below, CBS "made available" these performances in California. These facts preclude summary judgment as to these sound recordings.

With respect to its terrestrial radio broadcasts, CBS's Vice President of Programming, Jeffrey Sottolano, testified that CBS does not itself maintain any records that would identify the sound recordings that are publicly performed by any of its radio stations. (Sottolano Dep., at 42:14-16; Ex. 5.) Instead, Mr. Sottolano relies on Mediabase reports to know which recordings CBS publicly performed on its radio stations. (Sottolano Dep., at 36:11-14; Ex. 5.) Mediabase employs human listeners to track and record the recordings that are publicly performed on the radio stations being monitored by Mediabase. (Sottolano Dep., at 34:18-23; Ex. 5.) Mr. Sottolano testified that he has no reason to believe that Mediabase's records for any particular

McKool Smith Hennigan, P.C.
Los Angeles, CA

11

sound recording are wrong.  (Sottolano Dep., at 80:23-81:8; Ex. 5.)  In connection

with its Motion, CBS's employees reviewed Mediabase reports for each of its

California stations to determine which of the pre-1972 sound recordings listed in

Plaintiffs' schedules CBS may have publicly performed in the four years before the

filing of the complaint, and they determined that there is no record of CBS's

California radio stations publicly performing 161 recordings (Sottolano Decl. ¶¶ 4-7),

which means that Mediabase's records identified 13 of the recordings identified on

Plaintiffs' Schedules that were publicly performed on CBS's California radio stations

during the four years prior to the filing of the complaint.  (Block Decl. ¶¶ 12-16).

Again, these facts preclude summary judgment as to these 13 of Plaintiffs' sound

recordings.

### 2. Triable Issues Of Fact Exist As To CBS's Public Performance Of Plaintiffs' Other Sound Recordings

Additional, substantial evidence supports the finding that CBS publicly

performed another 40 of Plaintiffs' sound recordings, meaning that a material fact

dispute exists as to whether CBS publicly performed a total of 100 of Plaintiffs' sound

recordings during the four years prior to the filing of the complaint.  (Block Decl. ¶¶

20-23.)

Neither Mr. Sottolano nor Mr. Neiman address in their Declarations public

performances by CBS of Plaintiffs' sound recordings on any of CBS's simulcast

broadcasts.  Mr. Neiman testified at his deposition on March 9, 2016 that CBS has

records, created by a third party called Triton, identifying the songs that are publicly

performed on its terrestrial radio station simulcasts over Radio.com.[6]  (Neiman Dep.,

at 28:18-31:22; Ex. 4.) ("Triton Reports").  Despite having stipulated on November

30, 2015 in the Joint Report of Rule 26 Meeting of Counsel (ECF 66) that it would

---

[6] CBS' statement that: "For its terrestrial radio service, no playlist records exist" (Mot. at 9) is therefore false.

McKool Smith Hennigan, P.C.
Los Angeles, CA

collect and produce any such data and despite stating in a February 19, 2016 response to Interrogatory No. 17 that Triton tracked CBS's Internet simulcasts of terrestrial stations and that it was "in the process of gathering relevant documents," CBS did not produce the Triton Reports to Plaintiffs until March 24, 2016, after Plaintiffs were forced to raise this issue with the New York court.  (Block Decl. ¶¶ 19-20; Ex. 13)

On March 24, 2016, CBS produced what it purports to be the Triton Reports for CBS's simulcast stations on Radio.com for the time period from October 2011 to August 2015.  (Block Decl. ¶ 20.)  CBS has represented that the Triton Reports are compiled by Triton using CBS's data and then CBS submits the Reports to SoundExchange.  (Block Decl. ¶ 20)  Plaintiffs' counsel conducted searches of the Triton Reports produced by CBS and determined that 90 of Plaintiffs' sound recordings were identified in the Triton Reports and therefore were either publicly performed on a CBS terrestrial radio station (and simulcast by CBS over Radio.com to listeners throughout the U.S.) or on an Internet-only station through Radio.com, or both.  (Block Decl. ¶ 21; Ex. 7).  Thus, based on Messrs. Sottolano's and Neiman's declarations and the Triton Reports, there is evidence that CBS has publicly performed— on its terrestrial radio stations in California, simulcast on Radio.com from its terrestrial radio stations nationwide, and/or streamed through its Internet-only stations on Radio.com—at least 100 of Plaintiffs' pre-1972 sound recordings.  (Block Decl. ¶ 23.)  The Triton Reports are substantial evidence of CBS's publicly performing Plaintiffs' sound recordings, which precludes summary judgment.

**B.    CBS Is Liable For "Making Available" Plaintiffs' Sound Recordings**

CBS is also liable for making Plaintiffs' pre-1972 sound recordings available for public performance through their availability for broadcast by each of terrestrial radio stations and through streaming on Radio.com.  Although pre-1972 sound recordings are not subject to federal copyright law and instead are creatures of common law and California statutory law, the "make available" test for liability under

McKool Smith Hennigan, P.C.
Los Angeles, CA

1    the federal copyright laws should apply with equal force to California state common

2    and statutory law.

3         Courts have held that making copyrighted works available violates the

4    copyright owner's distribution rights.  *Hotaling v. Church of Jesus Christ of Latter-*

5    *Day Saints*, 118 F.3d 199 (4th Cir. 1997).  In *Hotaling*, a public library made several

6    unlawful copies of the plaintiff's work available on microfiche.  The library did not

7    keep records on the public's use of the microfiche, so that plaintiff was unable to

8    prove that anyone had actually used the unlawful copies.  *Id.*, at 203.   Nonetheless,

9    the court held that sufficient evidence existed to establish that the library distributed

10   the work. "When a public library adds a work to its collection, lists the work in its

11   index or catalog system, and makes the work available to the borrowing or browsing

12   public, it has completed all the steps necessary for distribution to the public." *Id.*

13   Were this not the case, "a copyright holder would be prejudiced by a library that does

14   not keep records of public use, and the library would unjustly profit by its own

15   omission." *Id.*

16        The Ninth Circuit also has held that making works available constitutes

17   infringement.  *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1014 (9th Cir.

18   2001) ("Napster users who upload file names to the search index for others to copy

19   violate plaintiffs' distribution rights."); *see also Perfect 10, Inc. v. Amazon.com, Inc.*,

20   508 F.3d 1146, 1162 (9th Cir. 2007) (recognizing the "'deemed distribution' rule" in

21   *Napster*); *Perfect 10, Inc. v. Rapidshare A.G.*, 2010 U.S. Dist. LEXIS 146053, at *9

22   (S.D. Cal. May 18, 2010) ("The *Amazon.com* decision implies that where an entity has

23   a collection of infringing materials and makes those materials available to the public,

24   it is deemed to have distributed those materials for purposes of 17 U.S.C. § 106(3).");

25   2-8 Nimmer on Copyright § 8.11[D][5] ("[C]opyright infringement cases against

26   filesharing defendants should be construed to state a prima facie case for violation of

27

28

McKool Smith Hennigan, P.C.
Los Angeles, CA

the distribution right simply by proof that the defendant in suit made the copyrighted

works available to the world in the peer-to-peer environment.").[7]

The same rationale for making musical works available for reproduction or

distribution applies for public performance, which is also among the ownership rights

to sound recordings.  The Central District of California has agreed—holding that the

possession of plaintiffs' copyrighted works within the defendant's publicly available

karaoke machines violated plaintiffs' exclusive public performance rights, even

though the defendant kept no record of which works were actually performed.  *Elohim*

*EPF USA, Inc. v. Total Music Connection, Inc.*, No. 14-CV-02496-BRO, ECF. No.

197 at 22 (C.D. Cal. Oct. 1, 2015)[8] ("[I]f Plaintiffs do indeed possess the exclusive

right to publicly perform and display the musical compositions at issue, Defendants

violated those rights by making the works available to the public in the indexes and

songbooks of the karaoke machines placed within the private rooms in Defendants'

establishments.").

---

[7] A number of district courts also have followed the "deemed distribution" rule in
finding liability when copyrighted material is merely made available to others.  *See*
*TIMPCO, LLC v. Implementation Servs., LLC*, 2010 U.S. Dist. LEXIS 103668, at *9
(S.D. Ind. Sep. 29, 2010) ("The Seventh Circuit has held that merely making
copyrighted material available to others is an act of copyright infringement."); *UMG*
*Recordings, Inc. v. Alburger*, 2009 U.S. Dist. LEXIS 91585, at *10 (E.D. Penn. Sep.
30, 2009) ("an individual violates the exclusive-distribution right by 'making
available' that illegally downloaded work to other internet users."); *Capitol Records,*
*LLC v. Seydou Kouyate*, 2008 U.S. Dist. LEXIS 118536, at *17 (N.D. Ind. June 19,
2008) ("[U]nauthorized sharing of sound recordings by making them available to
others have been assumed by the Seventh Circuit and the United States Supreme
Court to be acts of reproduction and distribution"); *Atl. Recording Corp. v. Anderson*,
2008 U.S. Dist. LEXIS 53654, at *9 (S.D. Tx. Mar. 12, 2008) ("[M]aking copyrighted
works available for download via a peer-to-peer network contemplates 'further
distribution,' and thus constitutes a violation of the copyright owner's exclusive
'distribution' right").

[8] Attached as Exhibit 11 to Block Decl.

1170914

McKool Smith Hennigan, P.C.
Los Angeles, CA

McKool Smith Hennigan, P.C.
Los Angeles, CA

1  CBS admittedly keeps a list of every sound recording contained in its "audio

2  vault" servers for each terrestrial radio station and for its Radio.com exclusive station

3  servers.  (Neiman Dep., at 23:7-15; Ex. 4; Neiman Decl. ¶ 6; Sottolano Dep., at 17:9-

4  17; 25:14-26:22; 48:1-6; Ex. 5.)  CBS also understands that people in California will

5  access recordings performed on Radio.com, as CBS includes on Radio.com specific

6  privacy information pertinent only to California residents (Block Decl. ¶ 24).  Thus,

7  even if CBS lacked records showing which songs it actually broadcast from its

8  terrestrial radio stations, simulcast from those stations, or streamed through its

9  exclusive Radio.com stations (which is not the case), CBS is still liable for taking all

10  the steps necessary for public performance of each sound recording in its databases

11  belonging to Plaintiffs.  *See Arista Records, Inc v. MP3Board, Inc.*, 2002 U.S. Dist.

12  LEXIS 16165, at *14 (S.D.N.Y. Aug. 29, 2002) ("a copyright holder may not be

13  required to prove particular instances of use by the public when the proof is

14  impossible to produce because the infringer has not kept records of public use").

15  **C.**     **The Remastered Copies That CBS Performed Are Pre-1972 Sound**

16  **Recordings Governed Under California, Not Federal, Law**

17  Cal. Civ. Code § 980(a)(2) provides:  "The author of an original work of

18  authorship consisting of a sound recording *initially fixed* prior to February 15, 1972,

19  has an exclusive ownership therein until February 15, 2047, as against all persons . . .

20  ."  (emphasis added.)  CBS does not dispute that Plaintiffs' master recordings capture

21  performances that were *initially fixed* before February 15, 1972.  CBS also does not

22  dispute that the vast majority of the sound recordings at issue that it broadcasted and

23  streamed are remastered copies of the exact same pre-1972 performances.  Instead,

24  CBS premises its motion on a legally-flawed argument that it played post-1972 sound

25  recordings rather than Plaintiffs' pre-1972 sound recordings because the copies in its

26  audio files had been remastered to a digital format.

27  But remastering sound recordings from one format to another, along with

28  mechanical processing to optimize the recording for the new format, does not convert

1170914

a pre-1972 sound recording into a post-1972 sound recording.  Converting a pre-1972 sound recording into a derivative work governed under federal copyright law requires more than mechanical optimization—it requires, at the very least, remixing, editing, re-sequencing, or the addition of new sounds.  CBS does not offer any evidence of such changes.  Its expert only determined through his "tests" that the remastered sound recordings are not "identical" to Plaintiffs' original.  That is not enough to convert Plaintiffs' pre-1972 sound recordings into post-1972 works—even if the law allowed the creation of federally-protected derivative works from pre-1972 sound recordings—which the Ninth Circuit has rejected.

### 1.     Remastering pre-1972 Sound Recordings Does Not Convert Them Into Post-1972 Sound Recordings

CBS is wrong on the law.  Remastering a pre-1972 sound recording does not convert it into a post-1972 sound recording or create a derivative work protectable under the federal copyright act—even if the remastered copy is not "identical" to the original master recording.

CBS fails to cite, much less acknowledge, the only case that addressed this exact issue and squarely held that remastering a pre-1972 sound recording does not convert it into a new sound recording subject to federal copyright law.  *Capitol Records, Inc. v. Naxos of Am., Inc.,* 4 N.Y.3d 540, 564-65 (2005).  The *Naxos* case began in 1999, when Naxos, without permission, began to reproduce and distribute restorations of Capitol Records' original recordings of certain musical performances from the 1930s, which had been embodied in shellac phonorecords.  Capitol Records sued Naxos in federal court for violation of its state common law rights in the original recordings.  The parties agreed that the restorations were covered by state common law and not federal law even though the restorations "involved artistic choices and the use of the latest digital software," for which "Naxos needed to employ significant effort to create an entirely new and commercially viable product," and "Naxos worked to create a new product with superior sound."  *Capitol Records, Inc. v. Naxos of Am.,*

17

McKool Smith Hennigan, P.C.
Los Angeles, CA

1    *Inc.*, 262 F. Supp. 2d 204, 208-09, 214, 215 (S.D.N.Y. 2003).  But applying New

2    York common law, the court dismissed, rejecting Capitol's claims.

3         On appeal, the Second Circuit certified to the New York Court of Appeals the

4    question of whether Naxos had independently created a "new product" from Capitol's

5    original sound recordings when it converted from the shellac medium to digital.

6    *Capitol Records, Inc. v. Naxos of Am., Inc*., 372 F.3d 471, 481 (2d Cir. 2004).  In

7    response, the New York Court of Appeals held that Naxos' digitally re-mastered

8    copies of Capitol's recordings were "pre-1972 recordings" subject to protection under

9    the common law of New York State.  *Naxos,* 4 N.Y.3d at 564.  In so holding, the court

10   found that Capitol's claims could not be defeated based on Naxos' alleged creation of

11   a new product:  "[T]he '[i]ndependent creation' of a new product '[can]not consist of

12   actual copying' of an entire work." *Id.* at 564 (quoting *Durham Indus., Inc. v Tomy*

13   *Corp.*, 630 F.2d 905, 910 (2d Cir 1980)).[9]

14        *Naxos* follows a long line of decisions holding that a change in the medium of

15   expression of a work does not change its legal status, even if there are changes to

16   accommodate the new medium.[10]  Likewise, courts have consistently agreed that re-

_____

18   [9] The court further found that even if the remastering had created a "new product"
19   subject to federal copyright, Capitol still maintained state common law rights in the
20   "performances embodied on the shellac records" to the extent Naxos' remasters
     "utilize[d] the original elements of the protected performances." *Id.* at 564-65 & n.11.
21   Under this reasoning, CBS's motion fails for an independent reason:  Even if the
22   remastered copies of Plaintiffs' sound recordings were subject to federal copyright
     protection, Plaintiffs would still maintain a separate California property interest in the
23   performances embodied in the remastered copies, which CBS infringed when it
24   publicly performed them.

25   [10] *See N.Y. Times Co. v. Tasini*, 533 U.S. 483, 502 (2001) ("the 'transfer of a work
26   between media' does not 'alter the character of' that work for copyright purposes");
     *Durham*, 630 F.2d at 909 (a change in medium does not affect a copyrighted work's
27   status); *Entm't Research Grp., Inc. v. Genesis Creative Grp., Inc.*, 122 F.3d 1211,
     1219-20 (9th Cir. 1997) ("making decisions that enable one to reproduce or transform
28   an already existing work into another medium or dimension - though perhaps quite

recording a sound recording cannot meet the originality requirements necessary to constitute a derivative work.[11]  As discussed, the U.S. Copyright Office also agrees that mechanically processing a pre-1972 sound recording into a new format, without substantively editing the underlying performance, does not create a post-1972 derivative work. [12]

CBS relies on two inapposite cases, neither of which involved pre-1972 sound recordings.  First, CBS cites *Maljack Productions v. UAV Corp.*, 964 F. Supp. 1416 (C.D. Cal. 1997).  *Maljack* did not involve remastered sound recordings and, contrary to CBS's assertions, the court did not hold that a soundtrack was eligible for copyright protection as a new work because it had simply been "remastered."  Instead, *Maljack* involved a "pan and scan" edited version of the 1962 motion picture McClintock!, created to prepare the film for video distribution and television.  In creating the 1993 version, in addition to the "pan and scan" changes, plaintiff significantly edited and changed the film's soundtrack by remixing, resequencing, sweetening, equalizing, balancing and stereoizing it, and also adding entirely new sound material.  *Id.* at 1418. In a challenge to the plaintiffs' copyright registration of the "pan and scan" version, the district court found the film, inclusive of the soundtrack, subject to federal

difficult and intricate decisions - is not enough to constitute the contribution of something 'recognizably his own'"); *L. Batlin & Son, Inc. v. Snyder*, 536 F.2d 486, 489 (2d Cir. 1976) (plastic model copy of cast iron Uncle Sam bank did not alter the copyright in the bank, even though there were differences between them).

[11] *See Agee v. Paramount Communs.*, 853 F. Supp. 778, 788-789 (S.D.N.Y. 1994), *aff'd in part on other grounds, rev'd in part on other grounds*, 59 F.3d 317 (2d Cir. 1995) ("Plaintiff has offered no evidence that the sounds in his recording were remixed, or that additional lyrics or musical variations were added, or that defendant took his recording and transformed it into a new original work."); *United States v. Taxe*, 380 F. Supp. 1010, 1013 (C.D. Cal. 1974) ("Obviously, the re-recording of a previously fixed song cannot meet the originality requirements . . .")

[12] U.S. Copyright Office, Library of Congress, Circular No. 56, *Copyright Registration of Sound Recordings* (2014) at 3 (attached as Ex. 4 to Strabone Decl.)

McKool Smith Hennigan, P.C.
Los Angeles, CA

copyright protection because (taking into account the copyright registration's presumption of validity) it was part of a new audio-visual work. But the court did not find that the copyright registration extended to original elements of McClintock!. Rather, the court found only that the "pan and scan" version and "the sound enhancements are new material protected by copyright." *Id.* at 1428. In marked contrast to the *Maljack Productions* case, this case involves no new creative contribution to a work deserving of copyright protection.

Second, CBS cites *Pryor v. Jean*, 2014 U.S. Dist. LEXIS 143515 (C.D. Cal. Oct. 8, 2014). That case concerned a 1974 sound recording of David Pryor's "Bumpin' Bus Stop" originally contained on a "Gold Future Record" and later licensed for remastering as a derivative work to Private Stock Records. Consistent with the license, Private Stock, after remastering, obtained a copyright registration that included the "Bumpin' Bus Stop" musical composition. Private Stock later licensed its sound recording of "Bumpin' Bus Stop" to defendants for sampling in movies and television. *Id.* at *3-5. Pryor's heirs sued defendants for copyright infringement, but the district court dismissed because heirs could not show that the samples came from Pryor's performance on the Gold Future Record (on which the heirs allegedly held a copyright) as opposed to the Private Stock album— on which Private Stock held the copyright and had licensed defendants. *Id.* at *11-12.[13] Like *Maljack*, *Pryor* has no application here: It is undisputed that Plaintiffs' original master recordings and CBS's copies capture the same performance and nobody has licensed any remaster to CBS.

The law precluding separate copyright protection for remastered sound recordings mechanically processed for optimization into a new format preserves the

---

[13] Indeed, it was undisputed that the "actual sounds" of David Pryor's voice saying the words "Step Up!," fixed in the Gold Future recording and the Private Stock recording were different. *See* Motion to Dismiss Third Amended Complaint, *Pryor v. Jean*, No. 13-cv-02867-DDP (C.D. Cal. Dec. 13, 2013), ECF No. 36 at 8:26-9:4 (attached as Ex. 12 to Block Dec.).

McKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA

1170914

McKool Smith Hennigan, P.C.
Los Angeles, CA

integrity of the copyright system.  If a derivative work could be created without some substantial, creative modification of the sound recording itself—through mixing, editing, resequencing, or adding/deleting sounds—the copyright duration could be extended indefinitely by continuing to remaster into new formats as technology changes.  Today, an owner of a pre-1972 sound recording has rights under state law until 2067.  17 U.S.C. § 301(c).  If that owner were able to claim a new copyright by remastering it in a digital format after 2000, then the copyright owner would have rights protectable under federal copyright law for the life of the author plus 70 years.  17 U.S.C. § 302(a).  But the scope and duration of copyright cannot be extended.  *Taxe*, 380 F. Supp. at 1013 ("[A] common sense reading of the sound recording amendment of 1971 yields the same result, since the restriction of protection to works fixed after February 15, 1972, would be meaningless if works fixed before that date could gain protection simply by being re-recorded in new albums.").

### 2. *CBS Performed Plaintiffs' Remastered Pre-1972 Sound Recordings, Not New Post-1972 Sound Recordings*

Mr. Geluso examined each sound recording file containing a remaster of Plaintiffs' pre-1972 works in CBS's audio files and compared each to Plaintiffs' original sound recording.  In examining the files, Mr. Geluso conducted critical listing tests, waveform analysis, and spectral analysis.  From these tests, Mr. Geluso reached two dispositive conclusions:  First, for 202 of the 219 sound recordings, Mr. Geluso concluded that CBS's remastered copy contained the same performance captured in Plaintiffs' original master sound recording.  (Geluso Dec. ¶¶ 10-11, 39-55.)  Second, Mr. Geluso concluded that the CBS remastered copy—while converted from an analog to digital format and optimized for the digital format—contained no remixing or editing, and that no sounds had been added or deleted sounds when compared to Plaintiffs' original recordings.  (*Id.*)  To the contrary, Mr. Geluso found that Plaintiffs' original master recordings were fully embodied in the CBS remasters.(*Id.*)  Mr. Geluso's testimony in this regard is not contradicted by CBS's declarants.  Mr.

1   Geluso's conclusions alone distinguish this case from both *Maljack* and *Pryor*, and
2   defeats CBS's motion.

3        Even if CBS's expert (Dr. Begault) disagreed with Mr. Geluso, that would only
4   raise a triable issue of fact precluding summary judgment. But Dr. Begault does not
5   disagree with Mr. Geluso. Indeed, Dr. Begault, after performing his tests, reached the
6   same conclusions: Plaintiffs' original master recordings and the corresponding
7   remastered copies capture the same, pre-1972 musical performances. (Begault Dep.
8   28:12-17, 29:5-14, 112:11-24; Ex. 9; *see also* Inglot Dep. 58:5-12, 83:6-10; Ex. 8.)
9   None of Plaintiffs' original master recordings were remixed, edited, resequenced, or
10  had sound added or deleted when remastered from the analog to digital format.
11  (Begault Dep., 114:21-25, 116:8-117:17; Ex. 9.)[14] Finally, Dr. Begault agreed that the
12  performances captured in Plaintiffs' original master recordings were embodied in the
13  remasters used by CBS. (Begault Dep., 125:20-126:18; Ex. 9.)

14       Dr. Begault reached additional conclusions with those tests, but those
15  conclusions are entirely irrelevant to whether the remastered sound recordings are
16  subject to federal copyright protection as derivative works. Dr. Begault admitted that
17  CBS's lawyers assigned him the task to determine whether Plaintiffs' original master
18  recordings "contain the same sound recording that CBS used." (Begault Decl. ¶ 15;
19  Begault Dep., 13:7-15; Ex. 9.) To determine whether the files contained the "same
20  sound recording," Dr. Begault created tests to determine whether the songs compared
21  were "recorded at the same time and with the same application of recording
22  engineering techniques" (Begault Dep., at 26:8-15; Ex. 9)—in other words, the same
23  purely mechanical process that CBS admits will not convert a pre-1972 recording into

24

McKool Smith Hennigan, P.C.
Los Angeles, CA

25       [14] Dr. Beguault's testimony is not surprising in that both he and Mr. Inglot
26  conceded that "remastering" does not involve remixing, rearranging, editing, re-
27  sequencing or the addition of new materials to the original sound recording. (Begault
28  Dep. 114:3-25, 115:8-117:17; Ex. 9; Inglot Dep. 55:3-57:13; Ex. 8.)

1170914

a post-1972 derivative work.  (Mot. at 5.)[15]  Thus, Dr. Begault's findings that the comparisons "failed" his tests made no difference to whether CBS publicly performed Plaintiffs' pre-1972 sound recordings.

Aside from Mr. Geluso's analysis, Plaintiffs' pre-1972 sound recordings have not been converted into post-1972 sound recording based on four additional, legally-compelling reasons:

*First*, a pre-1972 sound recording cannot be converted into a post-1972 derivative work under Ninth Circuit law.  "Under the Copyright Act, a work is not a 'derivative work' unless it is 'based upon one or more preexisting works' and, in order to qualify as a 'preexisting work,' the underlying work must be copyrightable."  *Ets-Hokin v. Skyy Spirits Inc.*, 225 F.3d 1068, 1078 (9th Cir. 2000); 1-3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright*, § 3.01.  None of Plaintiffs' original recordings are copyrightable under the Copyright Act because they were all fixed before February 1972.  Thus, they are not a "pre-existing work" that can be used to create a derivative work.  17 U.S.C. § 301(c).

*Second*, even if a pre-1972 recording could be a "pre-existing work," any changes during the remastering process are not independent and original expression entitled to protection.  "In order for a work to qualify as a derivative work it must be independently copyrightable."  *Wood v. Bourne Co.*, 60 F.3d 978, 990-91 (2d Cir. 1995); *McCormick v. Cohn*, 1992 U.S. Dist. LEXIS 21187, at *39 (S.D. Cal. July 31, 1992) ("A derivative work, however, must be 'substantially different from the underlying work to be copyrightable.'" (*quoting Gracen v. Bradford Exchange*, 698 F.2d 300, 305 (7th Cir. 1983)).  "Independent creation, in turn, means that a work

---

[15] Tellingly, Dr. Begault also conceded that his "tests" (which were designed to prove that remastering the sound recordings into a new format involved the use of mechanical processing to digitally optimize the sounds) had never been used, to his knowledge in determining issues of copyright infringement or even described in a publication for such use.  (Begault Dep., 102:24-104:25; Ex. 9.)

McKool Smith Hennigan, P.C.
Los Angeles, CA

1    must not consist of actual copying." *Durham*, 630 F.2d at 910 (quoting *L. Batlin*, 536

2    F.2d at 490).  Additionally, "there must be at least some substantial variation (from

3    the underlying work), not merely a trivial variation."  *Id.* (quoting *Batlin*, 536 F.2d at

4    491).  Further, "the requirement of originality [cannot] be satisfied simply by the

5    demonstration of 'physical skill' or 'special training' . . ." *Id.* (quoting *Batlin*, 536

6    F.2d at 491).  Here, CBS offers no evidence of independent and original expression,

7    entitled to protection, in the remastered sound recordings.  Both Dr. Begault and Mr.

8    Inglot agreed that removing Plaintiffs' original sound recording from the remastered

9    copy would leave nothing to perceive, thus confirming that any mechanical optimizing

10   in the format conversion process could not be independently copyrightable.  (Begault

11   Dep. 161:19-162:25; Ex. 9; Inglot Dep. 67:12-68:1; Ex. 8.)

12        *Third*, even if a pre-1972 sound recording could be a "pre-existing work" and

13   the mechanical optimizations in the engineered copy were sufficient to constitute

14   original and independent expression, Plaintiffs never authorized a remastering

15   engineer to make any such alterations.  17 U.S.C. § 103(a) ("protection for a work

16   employing preexisting material in which copyright subsists does not extend to any

17   part of the work in which such material has been used unlawfully.").  The exclusive

18   rights in a copyrighted work include the right to prepare derivative works based upon

19   the copyrighted work.  17 U.S.C. § 106(2).  Without the owner's consent, however,

20   the preparer of a derivative work cannot create a work protectable by copyright.  *U.S.*

21   *Auto Parts Network, Inc. v. Parts Geek, LLC*, 692 F.3d 1009, 1016 (9th Cir. 2012).

22   Plaintiffs never granted a license to create derivative works when converting the pre-

23   1972 sound recordings from analog to digital format, and CBS does not offer any

24   evidence to the contrary.   (Wilson Decl. ¶¶ 6, 9-12; Kartiganer Decl. ¶¶ 6, 9-12;

25   Tarnopol Decl. ¶¶ 6, 9-12; Couch Decl. ¶¶ 6, 9-12; Emmer Decl. ¶¶ 3-5; Johnson

26   Decl. ¶ 3.)  Thus, none of the remastered recordings can be derivative works under

27   federal copyright law.

28

McKool Smith Hennigan, P.C.
Los Angeles, CA

1170914

*Fourth*, even if the remastered copies of the original sound recordings constituted a derivative work under the Copyright Act, any copyright would only protect the new original and independent expression.  17 U.S.C. § 103(b) (The copyright in a derivative work "extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work."); *Durham*, 630 F.2d at 909 n.6.  The unauthorized use of the pre-existing material as contained in a derivative work is an infringement of the pre-existing material:  "[i]t is irrelevant whether the pre-existing work is inseparably intertwined with the derivative work."  *Stewart v. Abend,* 495 U.S. 207, 223 (1990); *Gilliam v. American Broadcasting Cos.*, 538 F.2d 14, 20 (2d Cir. 1976) ("[C]opyright in the underlying script survives intact despite the incorporation of that work into a derivative work").  Contrary to CBS's contentions (which its supporting witnesses disavowed in deposition), neither the distributors nor the Plaintiffs have attempted to register a federal copyright for any of the remastered copies of Plaintiffs' pre-1972 sound recordings.  (Wilson Decl. ¶¶ 13-14; Kartiganer Decl. ¶¶ 13-14; Tarnopol Decl. ¶¶ 13-14; Couch Decl. ¶¶ 13-14; Emmer Decl. ¶ 6; Johnson Decl. ¶¶ 8-9.)  While some of the distributors have registered copyrights for the compilations in the album and the liner notes, the registrations confirm they do not extend to the sound recordings themselves.  (*See e.g.*, Ex. 10).  Thus, Plaintiffs would still retain their common law rights in the performance embedded in any derivative works.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that CBS's motion be denied.

McKool Smith Hennigan, P.C.
Los Angeles, CA

1170914

DATED: April 4, 2015         Respectfully submitted,

MCKOOL SMITH HENNIGAN, P.C.


By:  */s/ Lawrence M. Hadley*
     RODERICK G. DORMAN (SBN 96908)
     rdorman@mckoolsmithhennigan.com
     ROBERT E. ALLEN (SBN 166589)
     rallen@mckoolsmithhennigan.com
     LAWRENCE M. HADLEY (SBN 157728)
     lhadley@mckoolsmithhennigan.com
     ALAN P. BLOCK (SBN 143783)
     ablock@mckoolsmithhennigan.com
     300 South Grand Avenue, Suite 2900
     Los Angeles, CA 90071
     T:  (213) 694-1200; F:  (213) 694-1234

MILLER LAW LLC

By:  */s/ Marvin A. Miller*
     MARVIN A. MILLER (admitted *pro hac vice*)
     mmiller@millerlawllc.com
     ANDREW SZOT (admitted *pro hac vice*)
     aszot@millerlawllc.com
     KATHLEEN E. BOYCHUCK
          (admitted *pro hac vice*)
     kboychuck@millerlawllc.com
     115 S. LaSalle St., Suite 2910
     Chicago, IL 60603
     T:  (312) 332-3400; F:  (312) 676-2676

     *Attorneys for Plaintiffs*
     ABS ENTERTAINMENT, INC., BARNABY
     RECORDS, INC., BRUNSWICK RECORD
     CORPORATION and MALACO, INC.

1170914

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

McKool Smith Hennigan, P.C.
Los Angeles, CA

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on April 4, 2016 to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system.  Any other counsel of record will be served by electronic mail, facsimile, U.S. Mail and/or overnight delivery.

*/s/ Yoshie Botta*
Yoshie Botta

1170914
PROOF OF SERVICE