**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| ABS ENTERTAINMENT, INC., an Arkansas corporation; BARNABY RECORDS, INC., a New York corporation; BRUNSWICK RECORD CORPORATION, a New York corporation; MALACO INC., a Mississippi corporation, each individually and on behalf of all others similarly situated., *Plaintiffs-Appellants*, <br><br> v. <br><br> CBS CORPORATION, a Delaware corporation; CBS RADIO, INC., a Delaware corporation; DOES, 1 through 10, *Defendants-Appellees.* | No. 16-55917 <br><br> D.C. No. 2:15-cv-06257-PA-AGR <br><br><br> ORDER AND AMENDED OPINION |

Appeal from the United States District Court
for the Central District of California
Percy Anderson, District Judge, Presiding

Argued and Submitted November 9, 2017
Pasadena, California

Filed August 20, 2018
Amended October 31, 2018

2      ABS ENTERTAINMENT V. CBS CORPORATION

Before:  Richard Linn,* Marsha S. Berzon,
and Paul J. Watford, Circuit Judges.

Order;
Opinion by Judge Linn

## SUMMARY**

### Copyright

The panel reversed the district court's grant of summary judgment in favor of the defendants on claims of violation of state law copyrights possessed by the plaintiffs in sound recordings originally fixed before 1972.

Under the Sound Recording Act, sound recordings fixed after February 15, 1972, are subject to a compulsory license regime for performance via digital transmission and are excused from infringement for performance via terrestrial radio.  Congress reserved governance of sound recordings fixed before 1972 to state statutory and common law and excluded such sound recordings from federal copyright protection until 2067.

The plaintiffs owned sound recordings embodying musical performances initially fixed in analog format prior

---

* The Honorable Richard Linn, United States Circuit Judge for the U.S. Court of Appeals for the Federal Circuit, sitting by designation.

** This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

ABS ENTERTAINMENT V. CBS CORPORATION          3

to February 15, 1972.  They remastered these pre-1972 sound recordings onto digital formats.

The panel held that the district court erred in finding a lack of a genuine issue of material fact about the copyright eligibility of remastered sound recordings distributed by the defendants.  The panel concluded that a derivative sound recording distinctly identifiable solely by the changes in medium generally does not exhibit the minimum level of originality to be copyrightable.

The panel held that the district court erred in concluding that plaintiffs' state copyright interest in the pre-1972 sound recordings embodied in the remastered sound recordings was preempted by federal copyright law.  The panel held that the creation of an authorized digital remastering of pre-1972 analog sound recordings that qualify as copyrightable derivative works does not bring the remastered sound recordings exclusively under the ambit of federal law.

The panel held that the district court abused its discretion by excluding the testimony of plaintiffs' expert, excluding certain reports as evidence of defendants' performance of plaintiffs' sound recordings in California, and granting partial summary judgment of no infringement with respect to the samples contained in those reports.

The panel concluded that the district court's strict application of its local rules with respect to the timeliness of plaintiffs' motion for class action certification was inconsistent with the Federal Rules of Civil Procedure and was thus an abuse of discretion.

4        ABS ENTERTAINMENT V. CBS CORPORATION

The panel reversed the grant of summary judgment and the striking of class certification and remanded for further proceedings.

## COUNSEL

Robert Edward Allen (argued), Alan P. Block, Roderick G. Dorman, and Lawrence M. Hadley, McKool Smith Hennigan P.C., Los Angeles, California; Kathleen E. Boychuck, Andrew Szot, and Marvin A. Miller, Miller Law LLC, Chicago, Illinois; for Plaintiffs-Appellants.

Robert M. Schwartz (argued), Amit Q. Gressel, Andrew J. Strabone, Victor Jih, and Moon Hee Lee, Irell & Manella LLP, Los Angeles, California, for Defendants-Appellees.

Richard S. Mandel, Cown Liebowitz & Latman P.C., New York, New York; George M. Borowsky, Recording Industry Association of America Inc., Washington, D.C.; for Amicus Curiae Recording Industry Association of America Inc.

Morgan E. Pietz, Gerard Fox Law P.C., Los Angeles, California; Katrina Novak, Lowe & Associates P.C., Los Angeles, California; for Amicus Curiae California Society of Entertainment Lawyers.

Steven G. Sklaver, Kalpana Srinivasan, and Stephen E. Morrissey, Susman Godfrey LLP, Los Angeles, California; Daniel B. Lifschitz, Maryann R. Marzano, and Henry Gradstein, Gradstein & Marzano P.C., Los Angeles, California; for Amicus Curiae Flo & Eddie Inc.

Andrew M. Gass and Elizabeth H. Yandell, Latham & Watkins LLP, San Francisco, California; Roman Martinez,

Latham & Watkins, Washington, D.C.; Sarang v. Damle, Latham & Watkins LLP, Washington, D.C.; for Amici Curiae iHeartMedia Inc. and National Association of Broadcasters.

Stephen B. Kinnard, Paul Hastings LLP, Washington, D.C.; Emmy Parsons, Garrett Levin, and Rick Kaplan, National Association of Broadcasters, Washington, D.C.; for Amicus Curiae National Association of Broadcasters.

---

## ORDER

The Opinion filed August 20, 2018, and reported at 900 F. 3d 1113, is hereby amended. The amended opinion will be filed concurrently with this order.

The panel has unanimously voted to deny Appellees' petition for panel rehearing. Judge Berzon and Judge Watford have voted to deny the petition for rehearing en banc. Judge Linn recommends denial of the petition for rehearing en banc. The full court has been advised of the petition for rehearing en banc, and no judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35. The petition for panel rehearing and the petition for rehearing en banc are **DENIED**.

Future petitions for rehearing or rehearing en banc will not be entertained in this case.

---

**OPINION**

LINN, Circuit Judge:

Appellants ABS Entertainment, Inc., Barnaby Records, Inc., Brunswick Record Corp. and Malaco, Inc. (collectively, "ABS") appeal from the grant of summary judgment by the Central District of California in favor of CBS Corporation and CBS Radio, Inc. (collectively, "CBS"), holding that CBS did not violate any state law copyrights possessed by ABS in sound recordings originally fixed before 1972. ABS also appeals from the district court's striking of its class action certification, and certain evidentiary rulings.

We conclude that the district court erred in finding a lack of a genuine issue of material fact about the copyright eligibility of remastered sound recordings distributed by CBS. We also conclude that the district court abused its discretion by excluding the testimony of ABS's expert Paul Geluso, excluding the Triton Reports as evidence of CBS's performance of ABS's sound recordings in California, and granting partial summary judgment of no infringement with respect to the samples contained in those reports. Finally, we conclude that the district court's strict application of its local rules with respect to the timeliness of ABS's motion for class action certification was inconsistent with the Federal Rules of Civil Procedure and was thus an abuse of discretion.

For the reasons set forth below, we reverse the grant of summary judgment and the striking of class certification, and remand for further proceedings consistent with this opinion.

I

In 1971, Congress passed the Sound Recording Act. This Act for the first time created federal copyright protection for certain sound recordings. Under that law, sound recordings fixed after February 15, 1972 were made subject to a compulsory license regime for performance via digital transmission and were excused from infringement for performance via terrestrial radio. 17 U.S.C. §§ 114, 301(c).

ABS owns sound recordings embodying musical performances initially fixed in analog format prior to February 15, 1972 ("pre-1972 sound recordings").[1]  As digital formats replaced analog ones, ABS hired remastering engineers to remaster the pre-1972 sound recordings onto digital formats ("remastered sound recordings").  In doing so, ABS determined to optimize the recordings for the new digital format using standard, technical processes to create accurate reproductions of its original pre-1972 analog recordings and did not set out to create any new and different sound recordings.  ABS contends that this resulted in a change in quality but not a substantial difference in the identity or essential character of the sound recordings themselves.  ABS argues that injecting a substantial difference in the digital remasters from their analog originals would have diminished the value of the remastered sound recordings, contrary to ABS's objective in seeking to fully exploit its intellectual property in those sound recordings.

---

[1] For purposes of this appeal, the sound recordings at issue are defined by a series of 174 "representative samples" by artists including Al Green, the Everly Brothers, Jackie Wilson, King Floyd, and other artists.

ABS did not enter copies of the contracts between ABS and the remastering engineers into the record, but both parties agree that ABS authorized the creation of the remastered sound recordings at issue here.[2]  There is no dispute that the remastered sound recordings contain only the sounds (i.e. the vocals and instruments) originally performed and fixed in the studio before 1972 and contained in the pre-1972 sound recordings, and that no sounds were removed or rearranged from the original fixed version.  ABS agrees that the remastered sound recordings are not identical to the pre-1972 sound recordings, but contends that any differences were trivial and of no copyrightable consequence.

CBS delivers music content through terrestrial radio and digital streaming, including 18 music stations in California that are themselves streamed over the internet in "simulcast."   CBS's Radio 2.0 system logs "all sound recordings it digitally transmits over the Internet," and a third party, Triton, tracks CBS's simulcasts.  CBS does not use any analog sound recordings; it exclusively relies on digitally mastered or remastered sound recordings for the content it delivers to its customers.  For all the broadcast content, CBS paid a royalty to the owner of the underlying musical composition.  For the digitally streamed content, CBS paid the compulsory license fee under the Sound Recording Act to Sound Exchange.  For content delivered by terrestrial radio, CBS does not pay a license fee pursuant, as

---

[2] The parties vigorously dispute whether the authorization to create the remastered sound recordings also authorizes the creation of derivative works, and which party bears the burden of proving such authorization (or lack thereof).

permitted, to the Sound Recording Act's safe haven for terrestrial radio performance. *See* 17 U.S.C. § 114(d).

## II

On August 17, 2015, ABS filed a putative class action against CBS in the Central District of California, alleging that CBS's transmission and distribution of the remastered sound recordings violated California state law—specifically, California Civil Code § 980(a)(2) (protecting the property rights of an author of a sound recording fixed prior to February 15, 1972); misappropriation and conversion; and unfair competition, under California Business and Professions Code § 17200.

On November 17, 2015, the district court denied a joint stipulation to extend the 90-day deadline for filing a motion for class action certification to allow for class certification discovery, explaining that there was "no show of cause, let alone good cause." On November 19, 2015, the expiration date of the local rule's 90-day deadline for filing of class certification, the court denied without explanation another joint stipulation to extend the filing date. That same day, ABS timely filed a motion for class certification. On November 25, 2015, the district court struck the motion for class certification because it set a hearing date for the motion beyond the 35-day period after service of process as required by the court's standing orders and it did not include a statement pursuant to Local Rule 7-3 that a "conference of counsel" took place prior to the filing of the motion. The court then struck ABS's class allegations as untimely filed under Local Rule 23-3.

CBS thereafter filed a motion for summary judgment, arguing that there was no genuine issue of material fact that the remastered sound recordings were authorized original

derivative works, subject only to federal copyright law. In support of its motion, CBS submitted declarations from music engineers, including from Durand R. Begault, attesting that the remastering process involved originality and aesthetic judgment. In response, ABS submitted expert declarations of its own, including from Paul Geluso, who testified that the pre-1972 and remastered recordings "embodied" the same performance based on waveform, spectral, and critical listening analysis.

The district court decided two important evidentiary issues and granted summary judgment to CBS. The district court excluded Geluso's testimony under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589–90 (1993) as "unscientific" and "unnecessary to aid a fact finder capable of listening to the sound recordings on his or her own," and, "[a]lternatively" because Geluso's testimony was "irrelevant." The court reasoned that Geluso limited his forensic analysis to only the first five seconds of each sound recording, which was "clearly inadequate to rule out the possibility that non-trivial differences exist between the [pre-1972 and remastered sound recordings]." The court also rejected Geluso's reliance on "critical listening" as undefined and unscientific, and objected to Geluso's failure to include in his report the results of his phase inversion testing, which the court categorized as "adverse to Plaintiffs' position."

Considering only Begault's expert testimony, the district court then held that there was no genuine issue of material fact that the remastering created original derivative works protected by federal copyright law. The district court explained that "during the remastering process, at least some perceptible changes were made to Plaintiff's Pre-1972 Sound Recordings," and that these changes were not merely

"mechanical" or "trivial" changes, but rather "reflect multiple kinds of creative authorship, such as adjustments of equalization, sound editing, and channel assignment." The court thus concluded that as to the 57 works reviewed by both parties' experts, the remastered sound recordings were entitled to federal copyright protection as original derivative works.

Next, the district court concluded that ABS authorized the creation of the remastered sound recordings, because ABS had failed to meet its burden to show that its authorization to create the remastered sound recordings did not extend to the creation of a derivative work, and because, in any event, "the right to claim copyright in a non-infringing derivative work arises by operation of law, not through authority from the copyright owner of the underlying work."

The district court also concluded that, because the remastered sound recordings, created after 1972, were original and authorized, the remastered sound recordings were exclusively governed by federal copyright law. Therefore, the district court held, CBS had the right to perform the remastered sound recordings by complying with the statutory compulsory license obligations and taking advantage of the terrestrial radio performance safe harbor under 17 U.S.C. § 114. The district court assumed that because the right to perform the remastered sound recordings had been secured, CBS's performance of the remastered sound recordings could not infringe the pre-1972 sound recordings.

The district court also held, in the alternative, that CBS was entitled to partial summary judgment of non-infringement with respect to 126 of the 174 representative remastered sound recordings because ABS failed to provide evidence of CBS's performance of those sound recordings.

The evidence presented with respect to the 174 samples breaks down as follows.  Sixty samples were contained in CBS's internal digital audio library, Radio 2.0, which tracks broadcast or transmission via CBS's internet-only radio stations.  The parties agree that for 48 of these, ABS presented evidence of CBS's broadcast or transmission of sound recordings embodying the same performances as ABS's pre-1972 sound recordings.  The parties also agree that nine sound recordings were not infringing because CBS's records show that it broadcast versions based on different performances than the pre-1972 sound recordings. Three of these sound recordings were not reviewed by the parties' experts. An additional 40 samples were contained exclusively in the Triton Reports, which are created by a third-party company to track "simulcasts"—live internet streams—of CBS's radio broadcasts across the United States.  The parties do not discuss on appeal the evidence available with respect to the remaining 74 sound recordings.

The district court concluded that the Triton Reports were hearsay and did not fall within the business records exception because "Plaintiffs have failed to establish any one of the requirements necessary for them to be admitted under the business records exceptions."  The district court thus concluded that ABS had failed to raise a genuine issue of material fact as to CBS's transmission or broadcast in California of all but the 48 samples both parties agree CBS transmitted.

ABS appealed each of the adverse rulings.

### III

We review the district court's grant of summary judgment *de novo*, asking whether the moving party has met its burden to prove the absence of genuine issues of material

fact. *U.S. Auto Parts Net., Inc. v. Parts Geek, LLC*, 692 F.3d 1009, 1014 (9th Cir. 2012). A genuine issue of material fact exists if, drawing all inferences in favor of the non-moving party, a reasonable jury could find in favor of the non-moving party. *Id.* Whether a work is protected by copyright law is a mixed question of law and fact, which we review *de novo*. *Ets-Hokin v. Skyy Spirits, Inc.*, 225 F.3d 1068, 1073 (9th Cir. 2000). We review the district court's evidentiary rulings for an abuse of discretion. *Fonseca v. Sysco Food Servs. Of Ariz., Inc.*, 374 F.3d 840, 845 (9th Cir. 2004).

## IV

We begin with the district court's determination that "there is no genuine dispute of material fact that CBS performed a post-1972 version of Plaintiffs' pre-1972 Sound Recordings which contained federally-copyrightable original expression added during the remastering process."

## A

The constitutional purpose of copyright law is "to promote the Progress of Science and the useful Arts" by securing to "authors the right to their original expression, but encourage[ing] others to build freely upon the ideas and information conveyed by a work." *Feist Pubs., Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 349–50 (1991). "The *sine qua non* of copyright is originality." *Id.* at 345. "Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity." *Id.* A product of independent creation is distinguished from a copy in that it contains something which "owes its origin" to the independent creator. *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 58 (1884). A copy, on the other hand, is not a separate

work, but a mere representation or duplication of a prior creative expression.[3]

A "derivative work" is defined in the Copyright Act as a work "based upon one or more preexisting works" that "recast[s], transform[s], or adapt[s]" a preexisting work and "consist[s] of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship." 17 U.S.C. § 101. A derivative work is copyrightable when it meets two criteria: (1) "the original aspects of a derivative work must be more than trivial," and (2) "the original aspects of a derivative work must reflect the degree to which it relies on preexisting material and must not in any way affect the scope of any copyright protection in that preexisting material." *U.S. Auto Parts*, 692 F.3d at 1016 (citing *Durham Indus. v. Tomy Corp.*, 630 F.2d 905, 909 (2d Cir. 1980)). This is known as the *Durham* test. Both prongs arise out of Copyright's basic focus on originality. The first prong asks "whether the derivative work is original to the author and non-trivial" and the second prong ensures that the derivative work author does not hinder the original copyright owner's ability to exercise all of its rights. *Id.* at 1017.

---

[3] The Copyright Act defines "Copies" as "material objects, other than phonorecords, in which a work is fixed by any method now known or later developed, and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. The term 'copies' includes the material object, other than a phonorecord, in which the work is first fixed." 17 U.S.C. § 101. "Phonorecords" are "material objects in which sounds, other than those accompanying a motion picture or other audiovisual work, are fixed by any method now known or later developed, and from which the sounds can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." *Id.*

Because derivative works do not start from scratch, courts have endeavored to determine the kinds of contributions in the derivative work that qualify as original. In most circumstances, derivative works contain obvious creative contributions and so are easily recognizable as distinct from the underlying work. The casting, lighting, cinematography, props, editing, acting, and directing required to craft a movie from a screenplay, for example, easily render the movie distinct from the screenplay. Likewise, the authors of most sound recordings that use a sample of another sound recording to create distinct derivative works do so by adding new vocals, instruments, and edits to the underlying sample. Where the alleged derivative work, however, is intended as, and is in fact, a direct representation of the original work, the contributions of the derivative work author are harder to identify.

This court applied the two-part *Durham* test in *Entertainment Research Group, Inc. v. Genesis Creative Group, Inc.*, 122 F.3d 1211 (9th Cir. 1997). In that case, Entertainment Research Group ("ERG") made three-dimensional inflatable costumes based on copyrighted characters like "Toucan Sam" and "Cap'n Crunch." *Id.* at 1217–18. In relevant part, the court, in applying the originality prong, concluded that the costume-maker's contributions—including the change in format from 2D to 3D; changes in the proportion of textures, facial features and facial expressions; and the changes attendant to the functional addition of movement—were insufficient to render the costumes copyright eligible as derivative works. *Id.* at 1223.

The court first discounted the changes occasioned by technical, functional, and utilitarian concerns, such as the differences in proportion (necessitated by the requirement

that a human body must fit within the costume) and texture (necessitated by the material choice), because copyright in a sculptural work is limited to its form and cannot extend to its mechanical or utilitarian aspects under 17 U.S.C. § 101. *Id.* at 1221. The remaining changes in the facial expressions were also deemed insufficient to support a derivative work copyright, because "no reasonable trier of fact would see anything but a direct replica of the underlying characters." *Id.* at 1224. "Viewing the three-dimensional costumes and the two-dimensional drawings upon which they are based, it is immediately apparent that the costumes are not exact replicas of the two-dimensional drawings." *Id.* at 1223. These identifiable changes "themselves reflect[] no independent creation, no distinguishable variation from preexisting works, nothing recognizably the author's own contribution that sets [ERG's costumes] apart from the prototypical [characters]" the costumes represented. *Id.* at 1223 (quoting *Durham*, 630 F.2d at 910). In other words, the costumes did not constitute new works, despite the independent decision-making involved in their creation. *Id.* at 1224 (holding that the different facial expressions, proportions, and functional capabilities were "clearly not the defining aspect[s] of the costumes" when viewed "in the context of the overall costume" and, thus, were not considered distinguishable variations capable of supporting independent copyright protection). The court then went on to apply the second prong of *Durham*, noting that because of the similarity between ERG's costumes and the underlying characters, granting a derivative work copyright in the costumes would improperly give ERG "a de facto monopoly on all inflatable costumes depicting the copyrighted characters also in ERG's costumes." *Id.*

The Tenth Circuit similarly held that a digital work must be more than a copy of an underlying analog work to support

copyright as a derivative work. In *Meshwerks, Inc. v. Toyota Motor Sales U.S.A.*, 528 F.3d 1258 (10th Cir. 2008), the Tenth Circuit considered the copyright eligibility of Meshwerks' digital wire frame models used as skeletons for the interactive display of Toyota's vehicle designs online and in advertising. *Id.* at 1260. Meshwerks measured Toyota's vehicles with an articulated arm tethered to a computer and mapped the results onto a computerized grid using modeling software; connected the measured points to create a wire frame; and manually adjusted about ninety-percent of the data points to make the models more closely resemble the vehicles. *Id.* at 1260–61. The Tenth Circuit drew a sharp distinction between copies and original works, explaining that copies cannot qualify for copyright protection "since obviously a copier is not a creator, much less an 'independent' creator." *Id.* at 1267 (citing Patry on Copyright § 3:28). The wire frames were copies, according to the court, because they "depict nothing more than unadorned Toyota vehicles—the car *as* car," the visual designs of "which do not owe their origins to Meshwerks." *Id.* at 1265, 1268.

*Meshwerks* relied on three important doctrines in coming to that conclusion. First, as in *Entertainment Research Group*, the mere act of translating the derivative work into a different medium did not confer a distinct identity on the derivative work. *Id.* at 1267 ("[T]he fact that a work in one medium has been copied from a work in another medium does not render it any the less a 'copy.'" (citing 2 Nimmer on Copyright § 8.01[B])); *id.* (noting that although the wire models did not "recreate Toyota vehicles outright—steel, rubber, and all," "what Meshwerks accomplished was a peculiar kind of copying"). Second, the court analyzed originality by comparing the start and end products—the underlying vehicle designs and the wire models—not the

process used to get from one to the other.  *Id.* at 1268 ("[I]n assessing the originality of a work for which copyright protection is sought, we look only at the final *product*, not the process, and the fact that intensive, skillful, and even creative labor is invested in the process of creating a product does not guarantee its copyrightability.").  Finally, the court considered Toyota's intent in authorizing Meshwerks to create an accurate representation of Toyota's vehicles, not something new and different:  "If an artist affirmatively sets out to be unoriginal—to make a copy of someone else's creation, rather than to create an original work—it is far more likely that the resultant product will, in fact, be unoriginal."  *Id.*

The Second Circuit considered the originality needed to justify copyright protection for a derivative work in *L. Batlin & Son, Inc. v. Snyder*.  536 F.2d 486 (2d Cir. 1976).  In that case, appellant Snyder obtained a copyright registration for a plastic version of a cast metal Uncle Sam bank that had previously entered the public domain.[4]  Snyder made several changes in the plastic version: he made it shorter "in order to fit into the required price range and quality and quantity of material to be used;"  changed the proportions of Uncle Sam's face, bag, hat, and eagle; changed the textures of several components;  created a single-piece mold incorporating the umbrella instead of the two-piece mold of

---

[4] The public domain metal bank comprised: "Uncle Sam, dressed in his usual stove pipe hat, blue full dress coat, starred vest and red and white striped trousers, and leaning on his umbrella, stands on a four- or five-inch wide base, on which sits his carpetbag. A coin may be placed in Uncle Sam's extended hand. When a lever is pressed, the arm lowers, and the coin falls into the bag, while Uncle Sam's whiskers move up and down. The base has an embossed American eagle on it with the words 'Uncle Sam' on streamers above it, as well as the word 'Bank' on each side."  536 F.2d at 488.

the metal bank; and replaced the arrows in the eagle's talons with leaves, because "the arrows did not reproduce well in plastic on a smaller size." *Id.* at 488–89.

Even though the plastic bank was not identical to the metal original, the Second Circuit held that the changes did not amount to a distinguishable variation in the identity or essential character of the original work. *Id.* at 491. The transfer of the expression from the underlying cast iron Uncle Sam to a plastic version, despite overcoming technical challenges and, arguably, improving the original in terms of lowering the price, did not result in a copyrightable derivative work, because the changes did not constitute the "substantial variation" necessary to support copyright. Instead, they were merely the "trivial" results of the "translation to a different medium." *Id.* The plastic bank was not a new work—it did not embody "the author's tangible expression of his ideas," *id.* at 492 (quoting *Mazer v. Stein*, 347 U.S. 201, 214 (1954)), and was thus a mere copy of the underlying work.

The Copyright Office guidance provided in Circular 56 reflects that a similar analysis applies specifically to derivative sound recordings.[5] In relevant part, Circular 56 explains the following about derivative sound recordings:

> A derivative sound recording is an audio recording that incorporates preexisting sounds, such as sounds that were previously registered or published or sounds that were

---

[5] Circulars provide Copyright Office guidance on various issues. We may rely on them as persuasive but not binding authority. *See Kitchens of Sara Lee, Inc. v. Nifty Foods Corp.*, 266 F.2d 541, 544 (2d Cir. 1959) (citing Copyright Office publication); *In re World Aux. Power Co.*, 303 F.3d 1120, 1131 n.73 (9th Cir. 2002) (citing Circular 4).

fixed before February 15, 1972. The preexisting recorded sounds must be rearranged, remixed, or otherwise altered in sequence or character, or the recording must contain additional new sounds. The new or revised sounds must contain at least a minimum amount of original sound recording authorship.

Examples of derivative sound recordings include:

  • A mashup comprising tracks and sounds from multiple sources.

  • Additional tracks added to a previously published album.

Mechanical changes or processes, such as a change in format, declicking, or noise reduction, generally do not contain enough original authorship to warrant registration

United States Copyright Office's Circular No. 56, *Copyright Registration for Sound Recordings*, Revised Sept. 2017 ("Circular 56"), available at <https://www.copyright.gov/circs/circ56.pdf>.[6] In common with the cases noted above, Circular 56 identifies original authorship as the touchstone

---

[6] The district court discussed an earlier version of Copyright Office Circular 56 and cited a key example therein of a derivative sound recording: "a remastering that involves multiple kinds of creative authorship, such as adjustments of equalization, sound editing, and channel assignment."  This example has since been removed from the updated version of Circular 56.

of a copyright eligible derivative work and calls for either
"additional new sounds" or some other minimum amount of
original sound recording authorship, such as the
rearrangement, remixing, or alteration of sounds in sequence
or character.  *Id.*  According to the Circular, changes to
format, declicking and noise reduction, even if perceptible,
do not amount to the minimal amount of original sound
recording authorship necessary under the law and do not
warrant separate copyright protection.

From the foregoing, it should be evident that a
remastered sound recording is not eligible for independent
copyright protection as a derivative work unless its essential
character and identity reflect a level of independent sound
recording authorship that makes it a variation
distinguishable from the underlying work.  The essential
character and identity of a sound recording include, *inter
alia*, the aggregate of the "emphasis or the shading of a
musical note, the tone of voice, the inflection, the timing of
a vocal rendition, musical or spoken," 1 Nimmer on
Copyright § 2.10 (2018); the choice of instrumental, vocal
and percussion components; and the subtleties of dynamics
and other performance characteristics that together result in
"something irreducible, which is one [band's] alone."  *See
Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239,
250 (1903) (Holmes, J.).  Such factors distinguish an original
vocal rendition of a song from the vocal rendition of the
same song by another singer and are not present when an
original vocal rendition is merely remastered.  A
remastering, for example, of Tony Bennett's  "I Left My
Heart in San Francisco" recording from its original analog
format into digital format, even with declicking, noise
reduction and small changes in volume or emphasis, is no
less Bennett's "I Left My Heart in San Francisco"
recording—it retains the same essential character and

identity as the underlying original sound recording, notwithstanding the presence of trivial, minor or insignificant changes from the original.  That is so even if the digital version would be perceived by a listener to be a brighter or cleaner rendition.

If an allegedly derivative sound recording does not add or remove any sounds from the underlying sound recording, does not change the sequence of the sounds, and does not remix or otherwise alter the sounds in sequence or character, the recording is likely to be nothing more than a copy of the underlying sound recording and is presumptively devoid of the original sound recording authorship required for copyright protection.  Such a work lacks originality.  This presumption may, of course, be overcome, by showing that the work contains independent creative content, recognizable contributions of sound recording authorship or variations in defining aspects that give a derivative sound recording a new and different essential character and identity.

A number of practical considerations, including but not limited to the considerations that follow, inform a determination of the essential character and identity of a remastered sound recording.  First, the mere translation of a work from an analog to a digital medium to take advantage of technological improvements does not itself transform the essential character and identity of the underlying work.  *See Meshwerks*, 528 F.3d at 1267 ("[W]e hold, as many before us have already suggested, that standing alone, '[t]he fact that a work in one medium has been copied from a work in another medium does not render it any the less a 'copy'''" (citing 2 Nimmer on Copyright § 8.01[B])); *L. Batlin*, 536 F.2d at 489 (holding that changes in the plastic bank, such as the "functional one of making a more suitable (and

probably less expensive) figure in the plastic medium" and the aesthetic decision to replace the arrows with feathers because arrows did not reproduce well in plastic, were not original); *Entm't Res. Grp.*, 122 F.3d at 1221, 1223 (with respect to sculptural works, explaining that "any aspects of ERG's costumes that are purely functional, utilitarian or mechanical will not be given any copyright protection" and agreeing "with the district court's conclusion that the differences in form, texture and proportionality that ERG points to as nontrivial differences all stemmed from functional considerations").  *See also Durham*, 630 F.2d at 913 ("[C]opyright protection extends only to the artistic aspects, but not the mechanical or utilitarian features, of a protected work.").  Such functionally driven decision-making does not demonstrate the kind of originality with which copyright is exclusively concerned.

Second, a remastering engineer's objective "to make a copy of someone else's creation, rather than to create an original work," *Meshwerks*, 528 F.3d at 1268, even if that task seeks to improve quality, brightness or crispness of sound, is persuasive evidence that the final product likely contains little more than a trivial contribution and does not, in fact, result in an original work.  *See Entm't Res. Grp.*, 122 F.3d at 1223 ("ERG's customers—the companies—wanted costumes replicating their characters.  Thus, because ERG followed detailed instructions from its customers regarding exactly how they wanted the costumes to appear, it cannot be said that ERG's artistic contributions were more than merely trivial contributions.").

Finally, the process used to create the derivative work is seldom informative of originality in the copyright sense. *Meshwerks*, 528 F.3d at 1268.  The remastering engineer's application of "intensive, skillful, and even creative labor . . .

does not guarantee its copyrightability." *Id.*; *see also L. Batlin*, 536 F.2d at 491 ("Nor can the requirement of originality be satisfied simply by the demonstration of 'physical skill' or 'special training.'"). In *Meshwerks*, the exercise of independent technical and aesthetic judgment in adjusting the wire-frames did not result in a copyright eligible work, as those efforts were directed wholly to more effectively *representing* the underlying works, not to changing or adding to those works. 528 F.3d at 1268.

## B

In this case, the district court determined that "at least some perceptible changes were made to Plaintiff's Pre-1972 Sound Recordings" and that these changes were not merely "mechanical" or "trivial." Therefore, the district court held, there was no genuine dispute of material fact that the remastered works performed by CBS were "sufficient[ly] original[]." *Id.* at 12. This conclusion was legal error.

In *Entertainment Research Group*, for example, the costumes were clearly distinguishable from the underlying characters. We nevertheless held that the costume-makers' contributions were not original because the costumes would not be identified as distinguishable variations; i.e., the essential character and identity of each were not changed. *Entm't Res. Grp.*, 122 F.3d at 1223–24 ("Viewing the three-dimensional costumes and the two-dimensional drawings upon which they are based, it is immediately apparent that the costumes are not exact replicas of the two-dimensional drawings," but there was no originality because "no reasonable trier of fact would see anything but a direct replica of the underlying characters."); *see also Meshwerks*, 528 F.3d at 1267 (holding that the derivative digital wire frame models were "a peculiar kind of copy" of Toyota vehicles, although the wire models did not "recreate Toyota

vehicles outright—steel, rubber, and all"); *Durham*, 630 F.2d at 909 ("The three Tomy figures are instantly identifiable as embodiments of the Disney characters in yet another form: Mickey, Donald and Pluto are now represented as small, plastic, wind-up toys," although the underlying Disney characters did not include the wind-up mechanism in the derivative toys.).

Here, there is no dispute that all of the sounds contained in the remastered sound recordings—the vocals, instruments, inflection, dynamics, rhythms, and sequences—were initially fixed in a studio before 1972. There is also no dispute that the remastering engineers did not add or remove any sounds and did not edit or resequence the fixed performances.  For these reasons, the remasters presumptively lacked the originality necessary to support copyright protection as derivative works.

The district court, in ruling otherwise and concluding that no genuine issues of material fact exist on the originality of the digital remasters, applied an incorrect test.  In doing so, the district court placed critical reliance on the testimony of CBS's expert, Begault.  Begault explained that the digitally perceptible changes to "timbre, spatial imagery, sound balance, and loudness range" that he identified in the remastered sound recordings were measures of sound *quality*.[7]  Such technical improvements associated with the

---

[7] Title 17, Section 114(b) explains that the exclusive right of a copyright holder in a sound recording "is limited to the right to prepare a derivative work in which the actual sounds fixed in the sound recording are rearranged, remixed, or otherwise altered in sequence or *quality*." (emphasis added).  We read "quality" in § 114 to be referring to character and identity rather than a measure of improvement. See *Quality*, Miriam-Webster (July 19, 2018), https://www.merriam-webster.com/dictionary/quality.

translation of the analog pre-1972 sound recordings into a digital medium, however, do not support a finding of originality. *See L. Batlin*, 536 F.2d at 489 (rejecting changes made for the "functional" purpose "of making a more suitable (and probably less expensive) figure in the plastic medium"); *Entm't Res. Grp.*, 122 F.3d at 1223 (discounting differences in form, texture and proportionality arising out of the need to create space for a human to fit into a 3-D costume); *Meshwerks*, 528 F.3d at 1267 (holding that the technical adjustments of data points to more accurately reflect Toyota vehicles in a digital medium did not constitute the kind of contribution to qualify for copyright).

The purpose and effect of the remastering here was similarly a technical improvement. In its brief to this court, CBS explained that the reason for the remastering was to overcome the technical limitations of vinyl using the "nearly unlimited" sound range that CDs could reproduce. William Inglot, a remastering engineer responsible for some of the remastered sound recordings here and one of CBS's witnesses, testified that his goal was to do a "good job," to "do a better version of maybe what the production process was at that time because you have a little more control than maybe they had," by "taking advantage of the technology."

Begault analyzed the differences between the pre-1972 sound recordings and the remastered sound recordings using sensitive digital analysis and concluded that the remastered sound recordings would be different if there was *any difference* in *any* of the four analyzed characteristics. But Begault nowhere analyzed whether the changes he identified reflected any original sound recording authorship that might have changed the essential character and identity of the resulting sound recordings. The technical changes as measured by sensitive digital analysis does not necessarily

result in a change in the essential character and identity of the work in question.  ABS's expert, Geluso, aptly explained this shortcoming of Begault's analysis: "I believe that two sound recordings would have to be nearly identical to pass all four of [Begault's] tests.  For example, Begault set a standard of 1 dB of loudness differential for two recordings as his passing mark.  This is unreasonably extreme.  In my experience, 1dB of dynamic range compression is barely audible and will most likely go undetected by a listener."  Geluso also explained that the spectral balance of a sound recording can be adjusted on most consumer listening equipment, and the loudness can be adjusted on most consumer software used to create and edit music.  It is unlikely that such changes—even if made with more technical expertise by a remastering engineer and fixed in a sound recording—would amount to a change in the essential character and identity of the sound recording.

The district court excluded several paragraphs of Geluso's declaration as unscientific, based on unreliable methodology, lacking adequate foundation as expert testimony, unnecessary and irrelevant.  The district court found Geluso's critical listening methods to be unscientific, and "unexplained in Mr. Geluso's declaration."  But in his declaration, Geluso cited an FBI report on forensic sound recording analysis that held out critical listening as an essential component of forensic audio analysis.  Also, despite Geluso's testimony that he critically listened to all of the recordings he examined, the district court found fatally deficient the fact that Geluso limited his waveform and spectral analysis to the first five seconds of each recording.  While the shortness of the technical analysis impacts the weight of that testimony, there is no reason to question the science behind or the methodology of such testing for whatever it may show.  And the district court failed to

explain why five seconds of waveform analysis was insufficient to determine whether the pre-1972 and remastered sound recordings embodied the same performances. Moreover, Geluso's testimony, offered in rebuttal to the testimony of CBS's expert, Begualt, addressed the nature and extent of the differences between the original analog recordings and the digitally remastered sound recordings and was thus directly relevant to the issue of originality before the court. The district court also found deficient the fact that Geluso excluded from his report a phase inversion test from the first test he attempted. But that is not an adequate basis to exclude Geluso's testimony. That test merely identifies the fact of difference—something that ABS and Geluso do not contest exists between the pre-1972 and remastered sound recordings. The district court's exclusion of Geluso's testimony was an abuse of discretion, and his testimony should be considered in full by the district court on remand.

The district court also erred in failing to consider ABS's objective in creating the digital remasters. ABS hired recording engineers to create digitally remastered sound recordings of the pre-1972 sound recordings in order to allow for digital distribution and compilation albums and to take advantage of the improvements enabled by digital technology, not to introduce any substantive changes. As one ABS representative explained: "we understood as the technology increased, as things went from LP and cassette to CD [that the recordings would be re-mastered] . . . in such a way that they could be CD's made out of them. They had to go digital. We knew they were going to have to be converted analog to digital." Plaintiff Brunswick's representative agreed, stating that "in order to release recordings in a digital format that they would in fact be remastered." And Inglot testified that his goal was to "do a

better version of maybe what the production process was at that time because you have a little more control than maybe they had" by "taking advantage of the technology." Another declaration submitted by Plaintiffs averred that they "never would have permitted a Licensee to make any substantial or non-trivial changes to the sound of the Recordings when creating a remastered copy." Nothing in the record suggests that ABS set out to make any substantive changes or distinguishable variations that would give the digital remasters a different essential character or identity, to add any original sound recording authorship or to do anything other than make accurate copies in digital format of the original analog sound recordings.

Notwithstanding the above, CBS argues that all that is needed to support copyright is "more than a merely trivial variation," *Schrock v. Learning Curve Int'l, Inc.*, 586 F.3d 513, 521 (7th Cir. 2009), and that this is the test mandated by *U.S. Auto Parts* and properly adopted by the district court. CBS argues that it met its burden when it pointed out deficiencies in ABS's claims, and that ABS failed to provide significant probative evidence that the differences between the pre-1972 and the remastered sound recordings were mechanical, trivial, or insufficiently original.

CBS is correct that the threshold of creativity for copyright eligibility often is characterized as minimal, and that the courts police the amount of creativity only within the "narrowest and most obvious limits." *Bleistein*, 188 U.S. at 251; 1 Nimmer on Copyright § 2.01[B][1] (2018). But that relatively low bar does not eliminate the fundamental requirement of originality that is the touchstone of copyright protection. Here, the district court's identification of "perceptible changes" between the recordings in characteristics relating to "quality" did not ensure that the

remastered versions contained *anything of consequence* owing its origin to the remastering engineers. As discussed above, a derivative sound recording that merely exhibits perceptible changes does not necessarily exhibit a change to the essential character and identity of the work or reflect the addition of even a minimal amount of sound recording authorship or originality. *See also* 1 Nimmer on Copyright § 3.03 (2018) ("Any variation will not suffice, but one that is sufficient to render the derivative work distinguishable from its prior work in any meaningful manner will be sufficient.").

CBS also argues that "copyrightability is [] purpose-agnostic," and that the creation of a derivative work for "the purpose of migrating expression from one format to another" is a proper copyrightable purpose, relying on *New York Times Co. v. Tasini*, 533 U.S. 483 (2001). CBS is incorrect. In *Tasini*, freelance article authors authorized the inclusion of their articles into a newspaper, a collective work. The authors sued when their articles were included in an electronic database of newspapers in a form excised from the newspaper of which they were a part. *Id.* at 491. The Supreme Court concluded that the authors *maintained* their copyright in the articles, and that the electronic database infringed the authors' copyright in their articles. *Id.* at 503–04. *Tasini* does not say that a mere migration of a work into a new medium justifies an independent copyright.

Finally, CBS argues that the district court was correct to rely on *Maljack Prods., Inc. v. UAV Corp.*, 964 F. Supp. 1416 (C.D. Cal. 1997), *aff'd sub nom. Batjac Prods. Inc. v. GoodTimes Home Video Corp.*, 160 F.3d 1223 (9th Cir. 1998) to support its understanding that changes in equalization and quality in a sound recording support a derivative work copyright. In *Maljack*, the derivative work

was a "panned and scanned" adaptation of a movie and its soundtrack. 964 F. Supp. at 1418. The enhancements to the public domain soundtrack there included "edit[ing] the motion picture's monoaural soundtrack by remixing, resequencing, sweetening, equalizing, balancing, and stereoizing it, and also add[ing] entirely new sound material." *Id.* Here the remastering process did not include remixing or stereoizing. The changes in the soundtrack in *Maljack* accompanied and had to track the changes to the visual changes resulting from the pan-and-scan film reformatting, which resulted in a cut of 44% of the film. *Id.* at 1427. Also, the soundtrack accompanying the pan-and-scan version was independently registered by the copyright office as a derivative work, creating a presumption of copyright validity that the court found was not overcome. *Id.* at 1428. None of these circumstances are present here. To the extent that *Maljack* held that the "noticeable improvement [in quality] over the public domain version" could create copyright eligibility, we do not consider that aspect of *Maljack* persuasive. *See id.*

We therefore conclude that a derivative sound recording distinctly identifiable solely by the changes incident to the change in medium generally does not exhibit the minimum level of originality to be copyrightable. In this case, the district court did not analyze whether the changes in quality identified by Begault were anything other than merely incidental to the transfer from the analog to the digital medium.

Nothing in this opinion should be construed to question or limit the creative contributions of the recording engineers and/or record producers responsible for the recording session that led to the initial fixation of the sound recording. The initial producer/engineer's role is often to work in

collaboration with the performing artists to make many of the creative decisions that define the overall sound of the recording as fixed, including such things as microphone choice, microphone placement, setting sound levels, equipment used, processing filters employed, tapes selected, session structure, and other similar decisions analogous to the creative choices of photographers that courts have consistently held to be original. *See United States Copyright Office and Sound Recordings as Works Made for Hire: Hearing Before the Subcomm. on Courts and Intellectual Property of the H. Comm. on the Judiciary*, 106th Cong. 2nd Sess. (2000) (statement of Marybeth Peters, Register of Copyrights) ("The copyrightable elements in a sound recording will usually, though not always, involve 'authorship' both on the part of the performers whose performance is captured and on the part of the record producer responsible for setting up the recording session, capturing and electronically processing the sounds, and compiling and editing them to make the final sound recording."); *cf. Burrow-Giles*, 111 U.S. at 60 (holding that photographs are copyrightable to the extent of the photographer's decisions with respect to costume, accessories, pose of subjects, light and shade and evoking the desired expression).

The role of remastering engineers, however is usually very different from the role of the studio engineers. Studio engineers' decisions almost always contribute to the essential character and identity contained in the original sound recording. By contrast, the remastering engineer's role is ordinarily to preserve and protect the essential character and identity of the original sound recording, and to present *that original sound recording* in the best light possible by taking advantage of technological improvements. For example, Inglot testified that his goal

was to "do a better version of maybe what the production process was at that time because you have a little more control than maybe they had" by "taking advantage of the technology."  Although we do *not* hold that a remastered sound recording *cannot* be eligible for a derivative work copyright, a digitally remastered sound recording made as a copy of the original analog sound recording will rarely exhibit the necessary originality to qualify for independent copyright protection.

C

The second prong of the *U.S. Auto Parts/Durham* test requires that a copyright-eligible derivative work must "reflect the degree to which it relies on preexisting material and must not in any way affect the scope of any copyright protection in that preexisting material."  *U.S. Auto Parts*, 692 F.3d at 1016.  This prong ensures that a derivative work author—even one who contributes the requisite amount of creative authorship under the first prong—does not "prevent the owner of the preexisting work from exercising some of its rights under copyright law."  *Id.* at 1017.  This prong protects the author's right to authorize later derivative works without concern for aggressive enforcement against those later derivative works by the earlier derivative work copyright holder.  In *Entertainment Research Group*, for example, we explained that "if ERG had copyrights for its costumes, any future licensee who was hired to manufacture costumes depicting these characters would likely face a strong copyright infringement suit from ERG."  122 F.3d at 1224; *see also U.S. Auto Parts*, 692 F.3d at 1020 (applying the second prong of the *Durham* test and concluding in that case, copyright in a derivative work would not circumscribe rights of the copyright holder in the underlying work).

The district court's failure to fully consider this second prong here was legal error.  *See Entm't Res. Grp.*, 122 F.3d at 1219 (adopting the *Durham* test over the previously applicable *Doran* test that looked only at substantial difference between the derivative and underlying work, "because the *Doran* test completely fails to take into account the rights of the holder of the copyright for the underlying work," and therefore "should not be applied to determine the copyrightability of a derivative work that is based on a preexisting work that is itself copyrighted.").  Moreover, applying that prong, there is at least a genuine issue of material fact whether granting copyright protection for the remastered sound recordings here would undermine ABS's rights in the pre-1972 sound recordings to authorize additional derivative works.  Were ABS intent on granting an authorization to create an intentionally derivative work, for example by authorizing use of the underlying works as samples or remixes, those authorized works would be at high risk of infringement suits from the remastered sound recording copyright holders.  This risk would, in effect, grant the remastered sound recording copyright holder a "de facto monopoly" on derivative works.  *See id.* at 1224.  Indeed, in this case, where the underlying and derivative works are both sound recordings with few, if any, readily discernable differences, and the derivative work is the only one available in the vastly more accessible and marketable digital medium, the danger that the copyright holder of the derivative work could bring suit against a potential licensee of the underlying work is particularly acute.

If, on remand, the factfinder concludes that any or all of the remastered sound recordings here *do* manifest a change sufficient to create a derivative, copyrightable work, the factfinder should also consider the effect of recognizing a copyright in the remastered sound recording on ABS's

ability to exercise whatever copyrights it may possess in the pre-1972 sound recording.

For the above reasons, we conclude that the district court erred in holding that there were no genuine issues of material fact that the remastered sound recordings used by CBS were independently copyright eligible. We therefore reverse the grant of summary judgment to CBS as to that issue.

## D

The parties here dispute whether ABS authorized the remastering engineer to create derivative works, whether such permission was necessary, and which party bears the burden to show such authorization (or lack thereof). This issue arises, of course, only if the remastered recordings were derivative works. As we have determined that CBS was not entitled to summary judgment on that question, we address the authorization issue for guidance on remand.

The owner of a copyright has the exclusive right to prepare derivative works, 17 U.S.C. § 106(2), and to grant or withhold authorization to create such derivative works. *Schrock*, 586 F.3d at 522–23. In *Schrock*, photographer Schrock was hired by Learning Curve to photograph Thomas the Tank Engine. *Id.* at 515. Learning Curve and HIT Entertainment, the Thomas the Tank Engine copyright holder, used Schrock's photographs for several years. *Id.* When Learning Curve stopped hiring Schrock as a photographer, he registered his photographs and sued Learning Curve and HIT for infringement. *Id.* Like here, it was undisputed that Schrock had permission to make the photographs. But Learning Curve argued that the photographer also needed Learning Curve's permission to copyright the photographs. *Id.* The district court granted summary judgment to Learning Curve, concluding that the

photographs were derivative works, and that although Schrock had permission to make the photographs, he did not have permission to copyright them. *Id.* The Seventh Circuit reversed, stating: "As long as he was authorized to make the photos (he was), he owned the copyright in the photos to the extent of their incremental original expression." *Id.* We agree with that holding. The Seventh Circuit also explained that although this was the default rule, parties could alter this rule by contract. *Id.* at 523–24. Because the license agreements among the parties were not entered into the record, the Seventh Circuit remanded to the district court to determine whether the parties altered the default rule by contract. *Id.* at 525.

It is undisputed here that the remastering engineers were authorized to do exactly what they did. On remand, if the authorization issue is raised in a further summary judgment motion or at trial, the district court should give ABS the opportunity to produce copies of its license agreements and should determine whether any such agreements altered the default rule on authorization.

## V

We next address whether the district court abused its discretion in excluding the Triton Reports as evidence under the business records exception. Business records may be admitted under Fed. R. Evidence 803(6) when:

(A) the record was made at or near the time by—or from information transmitted by—someone with knowledge;

(B) the record was kept in the course of a regularly conducted activity of a business. . .

(C) making the record was a regular practice of that activity;

(D) all these conditions are shown by the testimony of the custodian or another qualified witness, . . . and

(E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

Fed. R. Evidence 803(6).

ABS argues that the district court abused its discretion in rejecting the Triton Reports because those reports fit squarely within the business records hearsay exception. CBS argues that Mr. Neiman, a CBS employee relied upon by ABS to provide the foundation for the business records exception, did not know how the Triton Reports were made or maintained, *see NLRB v. First Termite Control Co.*, 646 F.2d 424, 427 (9th Cir. 1981), and was not a Triton employee.

We conclude that Mr. Neiman was qualified to establish the foundation for the business records exception, and that the district court abused its discretion in excluding the Triton Reports. The business records exception only requires "someone with knowledge" about the record-keeping, not necessarily an employee of the business or someone with knowledge of how the reports were made or maintained. *See FDIC v. Staudinger*, 797 F.2d 908, 910 (10th Cir. 1986). Mr. Neiman testified that Triton was hired by CBS to create the reports, and that CBS sent those reports to Sound Exchange to determine artist royalties.

We agree with ABS that *First Termite Control* is inapposite here. *First Termite Control* held that business records, to be admissible under the business records exception, must be supported by testimony of a witness knowledgeable about the creation and maintenance of those records. 646 F.2d at 417. But in that case, the accuracy of the records was contested. Here, CBS itself relied on the reports to establish its royalty payments to Sound Exchange in the ordinary course of business. The accuracy of the records is not in question. In a similar situation, we have held that third party reports of this kind fall within the business records exception. *See United States v. Childs*, 5 F.3d 1328, 1334 and n.3 (9th Cir. 1993) (distinguishing *First Termite Control* due to reliance on third party reports by company challenging their admissibility). CBS has presented no evidence or argument showing that the Triton Reports were unreliable or inaccurate.

The district court also held that, if it were to consider the Triton Reports, it would nevertheless conclude that the listing of a name and song title in the Triton Reports was legally insufficient to create a genuine issue of material fact "[a]bsent the comparative analysis" to show that the performed sound recordings were not different recordings.

We conclude that the district court here erroneously decided a genuine issue of material fact at summary judgment. We agree with ABS that the Triton Reports contain an album title, and sometimes the company label, and so would be sufficient for a jury to infer that the records CBS performed were the versions captured in Plaintiffs' pre-1972 sound recordings. The Triton Reports were used by CBS to govern the royalties paid to recording artists via Sound Exchange; CBS has failed to present evidence that these same reports were not sufficient to identify the

recording artists or the versions performed.  The district court erred in finding the absence of a genuine issue of material fact with respect to the samples listed in the Triton Reports.

## VI

Finally, we address the district court's dismissal of ABS's class certification motion.

Central District of California Local Rule 23-3 requires Plaintiffs to file a motion for class certification within ninety days after service of the complaint.  The parties here twice stipulated to extend the deadline, explaining in the second stipulation that ABS needed more time for class action-focused discovery.  The district court denied the first stipulation for failure to show good cause, and denied the second without explanation.  The district court did not address the asserted need for pre-certification discovery.

Despite the district court's rulings, ABS timely filed its motion for class certification on November 19, 2015.  The district court struck the motion because of two technical deficiencies: (1) noticing the hearing outside the thirty-five-day period required by the Judge's Standing Order and (2) not including in the notice of motion a statement that the parties had met and conferred and the date on which such a conference took place, as required by Local Rule 7-3.  Having thus stricken the timely motion, the district court then dismissed the motion for class certification for failure to file a timely motion for class certification under Local Rule 23-3.

ABS argues that the district court abused its discretion in striking the timely filed motion as a sanction for what it categorizes as "trivial" omissions in the notice.

Central District of California Local Rule 23-3 sets a strict 90-day time frame from the filing of a complaint to the motion for class action certification. This bright line rule is in direct contrast to the flexibility of the Federal Rule, which calls for a determination on class certification "[a]t an early practicable time after a person sues or is sued as a class representative." Fed. R. Civ. P. 23(c)(1)(A). That flexible approach makes sense. The class action determination can only be decided after the district court undertakes a "rigorous analysis" of the prerequisites for certification. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–51 (2011) (quoting *Gen. Tele. Co. of SW v. Falcon*, 457 U.S. 147, 161 (1982)). To undertake that analysis may require discovery. *Kamm v. Cal. City Dev. Co.*, 509 F.2d 205, 210 (9th Cir.1975) ("The propriety of a class action cannot be determined in some cases without discovery;" "To deny discovery in [such cases] would be an abuse of discretion.").

The district court's actions here demonstrate the impracticability of the 90-day limit, particularly in combination with the district court's summary and unexplained denial of the parties' joint stipulation to extend the 90-day deadline based on the need for pre-certification discovery. *See* Barbara J. Rothstein & Thomas E. Willging, Federal Judicial Center, *Managing Class Action Litigation: A Pocket Guide for Judges* 9 (3d ed. 2010) ("Considering [Fed. R. Civ. P. 23(c)(1)], you should feel free to ignore local rules calling for specific time limits; such local rules appear to be inconsistent with the federal rules and, as such, obsolete."); Federal Judicial Center, *Manual for Complex Litigation, Fourth* § 21.133 ("Some local rules specify a short period within which the plaintiff must file a motion to certify a class action. Such rules, however, may be inconsistent with Rule 23(c)(1)(A)'s emphasis on the parties' obligation to present the court with sufficient

information to support an informed decision on certification. Parties need sufficient time to develop an adequate record.").

Although the district court's application and interpretation of its Local Rules is entitled to "a large measure of discretion," *Lance, Inc. v. Dewco Servs., Inc.*, 422 F.2d 778, 784 (9th Cir. 1970), Local Rules cannot be incompatible with Federal Rules. Fed. R. Civ. P. 83(a)(1). We conclude that the bright-line of Local Rule 23-3 is incompatible with Federal Rule of Civil Procedure 23.

We therefore reverse the district court's striking of ABS's certification motion, and remand for consideration of the class action motion on the merits, including reconsideration of whether pre-certification discovery is warranted.

## VII

On October 11, 2018, Congress enacted the Orrin G. Hatch-Bob Goodlatte Music Modernization Act, Pub. L. No. 115-264 ("Music Modernization Act"). That Act replaced 17 U.S.C. § 301(c) with a new section preempting certain state law claims for digital transmissions of pre-1972 sound recordings that occur after the effective date of the Act. *See* Pub. L. No. 115-264, sec. 202(a)(1). The Act also includes a provision that

> preempts any claim of common law copyright or equivalent right under the laws of any State arising from a digital audio transmission or reproduction that is made before the date of enactment of this section of a sound recording fixed before February 15, 1972, if [certain requirements for compulsory licensing and other criteria are met].

42      ABS ENTERTAINMENT v. CBS CORPORATION

Pub. L. No. 115-264, sec. 202(a)(2) (to be codified at 17 U.S.C. § 1401(e)).

We need not and do not decide the extent to which these and other sections of the newly passed legislation may be relevant to any remaining issues and leave those determinations to the district court to decide in the first instance on remand.

VIII

For the reasons discussed above, we **REVERSE** the district court's grant of summary judgment.  We also **REVERSE** the district court's striking of ABS's class action motion as untimely, and the exclusion of Geluso's testimony.   We **REMAND** for further proceedings consistent with this opinion.   The district court should consider ABS's request for continuance of pre-certification discovery, and, if appropriate, the merits of ABS's class action motion, at an early practicable time, as well as any other issues it deems necessary.



CIRCULAR

**56**

Copyright Registration for
# Sound Recordings

A sound recording is generally a recorded performance, often of another work. It must be fixed— captured in a medium from which it can be perceived, reproduced, or otherwise communicated—in a digital track, disc, tape, or other format. This circular introduces legal concepts and registration issues related to sound recordings. It covers

- Distinction between sound recordings and other works
- Completing an application
- Deposit requirements
- Registering multiple sound recordings
- Scope of copyright protection

This circular provides general information about the require- ments for registering sound recordings with the U.S. Copy- right Office. For specific information about this topic, see **chapter 800** of the *Compendium of U.S. Copyright Practices, Third Edition.*[1]

## What is a Sound Recording?

The Copyright Act defines sound recordings as "works that result from the fixation of a series of musical, spoken, or other sounds but not including sounds accompanying a motion picture or other audiovisual work." Generally, a sound recording is a recorded performance, often of another work. A sound recording must be fixed, meaning that the sounds must be captured in a medium from which they can be perceived, reproduced, or otherwise communicated. The author may fix the sounds in a digital track, disk, tape, or other format.

Common examples of sound recordings include an audio recording of:

- A person singing a song or playing a musical instrument.
- A person reading a book or delivering a lecture.
- A group of persons hosting a podcast or performing a radio play.
- A person speaking, a dog barking, a bird singing, wind chimes ringing, or other sounds from the natural world (assuming the recording contains a sufficient amount of production authorship).

A sound recording typically includes the contributions of the parties whose performance is captured in the recording and the parties who captured and processed those sounds to make the final recording. Short sound recordings may lack



a sufficient amount of authorship to warrant copyright protection, just as words and short textual phrases are not copyrightable. Sound recordings captured by purely mechanical means without originality of any kind also lack a sufficient amount of authorship to warrant copyright protection.

## Sound Recordings Distinguished from Underlying Creative Works

Sound recordings often contain other separate copyrightable creative works, such as songs, plays, lectures, or readings. The copyright in a sound recording covers the recording itself. It does not cover the music, lyrics, words, or other underlying content embodied in that recording. For example, the song "Rolling in the Deep" authored by Adele and Paul Epworth and a recording of Aretha Franklin singing "Rolling in the Deep" are two distinct works. The underlying music and lyrics are a "musical work," and a recording of an artist performing that song is a "sound recording."

This circular focuses on registration issues involving sound recordings. It does not address registration of the music, lyrics, or other content that may be embodied in the recording itself. For information on registering a song, book, or other content that may be embodied in a sound recording, see *Copyright Registration for Musical Compositions* (**Circular 50**) and **chapter 700** of the *Compendium*. For information on registering a sound recording together with the content embodied in that recording, see *Copyright Registration of Musical Compositions and Sound Recordings* (**Circular 56A**).

## Sound Recordings Distinguished from the Sounds Accompanying a Motion Picture

There is a legal distinction between a sound recording and the soundtrack for a motion picture or other audiovisual work. The Copyright Act states that "sounds accompanying a motion picture or audiovisual work" are not sound recordings. These types of sounds are considered part of the motion picture or audiovisual work.

Common examples of works that do not qualify as sound recordings include:

- The soundtrack for a cartoon, documentary, or major motion picture.

- The soundtrack for an online video, music video, or concert video.

- A musical performance during a scene or during the credits for a motion picture.

## Sound Recordings Distinguished from Phonorecords

A sound recording is not the same as a phonorecord. A phonorecord is the statutory term for a physical object that contains a sound recording, such as a digital audio file, a compact disc, or an LP. The term "phonorecord" includes any type of object that may be used to store a sound recording, including digital formats such as .mp3 and .wav files.

## Derivative Sound Recordings

A derivative sound recording is an audio recording that incorporates preexisting sounds, such as sounds that were previously registered or published or sounds that were fixed before February 15, 1972. The preexisting recorded sounds must be rearranged, remixed, or otherwise altered in sequence or character, or the recording must contain additional new sounds. The new or revised sounds must contain at least a minimum amount of original sound recording authorship.

Examples of derivative sound recordings include:

- A mashup comprising tracks and sounds from multiple sources.

- Additional tracks added to a previously published album.

Mechanical changes or processes, such as a change in format, declicking, or noise reduction, generally do not contain enough original authorship to warrant registration.

## Registering a Sound Recording

To register a claim to copyright in a sound recording, you must submit the following to the Copyright Office: (1) a completed application form; (2) a nonrefundable filing fee; and (3) the required "deposit copies" of your work. This circular highlights some common issues in registering a sound recording with the Copyright Office. For more guidance in registering a sound recording, see **chapter 800**, section 803.9 of the *Compendium*. For general registration issues, see *Copyright Registration* (**Circular 2**).

## Completing the Application

When completing an online application, the Copyright Office offers the following tips.

### Type of Work

- When you begin an application, select the "Sound Recording" option on the "Type of Work" screen. The questions you encounter when filling out the application are based on the choice you make at the beginning of the application. If you select the wrong option you will need to start over.

### Title

- Provide the title exactly as it appears on the work itself.

- When registering multiple sound recordings as an unpublished collection (see below), provide a title for the collection as a whole as well as the titles of the individual works within the collection.

- When registering multiple sound recordings as a collective work or a unit of publication (see below), be sure to include the album title and list the individual track titles in the same order that they appear on the album.

*Publication*

"Publication" occurs when phonorecords of a work are distributed to the public by sale, transfer of ownership, or by rental, lease, or lending. Offering to distribute phonorecords to a group of persons for the purpose of further distribution or publicly performing the work also constitutes publication. Simply performing a sound recording publicly does not constitute publication.

- If the work has not been published, state that the work is "unpublished."
- If the work has been published, give the month, day, and year that phonorecords were first distributed to the public or first offered to a group of persons for further distribution or public performance.

*Author*

- The author of a sound recording is the performer featured in the recording and the producer who captured and processed the sounds that appear in the final recording.
- If the performer or producer created the sound recording during the course of his or her employment under a typical employment relationship, then the sound recording is a work made for hire, and the employer is the author of the sound recording.
- If the performer or producer created the sound recording for a third party as a compilation or contribution to a collective work, and if the parties agreed in writing that the sound recording will be a "work made for hire," then the third party is the author of the work.

For more information on works made for hire, see *Works Made for Hire* (**Circular 30**).

*Type of Authorship*

- When registering a sound recording, check the box for "Sound Recording"
- When registering artwork, photographs, or text of liner notes, include a brief statement to that effect in the "Other" field.
- When registering a compilation or a collective work (see below), state "compilation of sound recordings" in the "Other" field.

*Limitation of Claim*

- When registering a derivative sound recording, identify the preexisting material in the "material excluded" field and identify the new material in the "new material included" field. If the preexisting material has been registered with the Copyright Office, include the registration number and year.

**Submitting the Deposit Copies of the Work**

To register your sound recording, you must submit the work to the Copyright Office. Once a deposit has been submitted, it becomes part of the public record and cannot be returned.

When registering a sound recording that is unpublished or published solely in a digital form, the Copyright Office strongly encourages you to submit the deposit as a digital file uploaded through the online registration system. Do not also submit a physical phonorecord, such as a CD, flash drive, or other physical storage device. Each file must be uploaded in an **acceptable file format** and each uploaded file must not exceed 500 MB in size.

When you are registering a sound recording published in a physical format, such as a compact disc or LP, submit the work in the physical format, even if there is a corresponding digital version. To submit a physical copy of your work after completing an online application, print a shipping slip from the bottom of the "Submit Your Work" screen and send the shipping slip and deposit in the same package to the address given on the shipping slip. To submit a physical copy of your work with a paper application, complete Form SR and submit the deposit in the same package with the application and the filing fee.

If your sound recording has been published in the United States, you may need to comply with the "best edition" requirement by sending two copies of the "best" edition that exists at the time of registration. The "best" edition generally is the highest quality edition that has been publicly distributed in the United States. The Library of Congress has identified the following list, in descending order, of what it considers to be the best edition for sound recordings:

1. Compact disc
2. Vinyl disc
3. Open-reel tape
4. Cartridge tape
5. Cassette tape

For example, if the work was published both on compact disc and vinyl disc before the date of the application to register the work, you should submit the compact disc rather than the vinyl disc.

If your sound recording has not been published in any of the formats listed above, you may upload a digital file that contains any published version of the work.

**Registering Multiple Sound Recordings**

As a general rule, you must submit a separate application, filing fee, and deposit for each work you want to register. It may be possible to register multiple sound recordings with one application if they qualify for one of the following special registration accommodations.

**Unpublished Collection**

You may register multiple unpublished sound recordings as an "unpublished collection" if at least one performer or one producer created or co-created all of the recordings and if the claimant for each recording is the same person or organization.

*Example*

Sue Smith and Joe Jones co-create five unpublished sound recordings, and co-own the copyright. They may register the five unpublished sound recordings on one application. The registration will cover all five sound recordings.

**Collective Work**

You may register multiple sound recordings as a "collective work" if they have been assembled together into a collective whole, such as a digital album or compact disc. The registration will cover the copyrightable authorship in the selection, coordination, or arrangement of the collective work as a whole. It also may cover each individual sound recording if (1) the collective work and the individual sound recordings are owned by the same party, and (2) the individual sound recordings have not been previously published or previously registered and are not in the public domain.

*Examples*

This year, the Oldies Recording Company published a "best of" album titled "Greatest Hits from the Age of Aquarius" featuring sound recordings originally published in the late 1970s. The Oldies Recording Company may register "Greatest Hits from the Age of Aquarius" as a collective work. The registration will cover the authorship involved in creating the album as a whole, but will not cover the individual sound recordings because they were previously published.

ABC Records, Inc., publishes a new album containing twelve new tracks that were never before published. ABC Records owns the copyright in both the album and the individual tracks. ABC Records may register the album as a collective work. The registration will cover both the album and the sound recordings because the copyright in both the sound recordings and the album are owned by the same party.

**Unit of Publication**

You may register multiple sound recordings as well as accompanying text and artwork as a "unit of publication," if they were physically packaged or bundled together and if all of the recordings were first published together as that integrated unit. In addition, the entity that bundles the works together as the integrated unit must be the claimant in all the works that are submitted for registration.

*Example*

ABC Records bundles ten sound recordings on a CD with an insert containing text and photographs, distributes the packaged unit to the general public, and owns the copyright in the sound recordings, text, and photographs. ABC Records may register the sound recordings, text,

and photographs with one application as a unit of publication. The registration will cover all copyrightable content in the sound recordings, text, and photographs.

For more information concerning these special registration accommodations, see *Multiple Works* (**Circular 34**).

## Copyright Protection in Sound Recordings

Generally, the owner of a sound recording does not have the exclusive right to publicly perform that work under the Copyright Act. However, the owner of a sound recording does have the exclusive right to publicly perform a sound recording by means of a digital audio transmission.

Before February 15, 1972, federal copyright law did not protect sound recordings, but common law, or in some cases statutes enacted in certain states, generally did. In 1971, Congress amended the copyright law to provide federal copyright protection for sound recordings fixed and first published with a statutory copyright notice on or after February 15, 1972. All sound recordings created after January 1, 1978, are automatically protected by copyright. A sound recording is considered created when it is "fixed" in a phonorecord for the first time. Neither registration in the Copyright Office nor publication is required for protection under the present law.

Before March 1, 1989, the use of copyright notice was mandatory on all visually perceptible copies or phonorecords of published works, and any work first published before that date should have carried a notice. The copyright notice is optional for works published on and after March 1, 1989. For more information about copyright notice, see *Copyright Notice* (**Circular 3**).

The Uruguay Round Agreements Act, which became effective on January 1, 1996, restored copyright protection for certain unpublished foreign sound recordings fixed before February 15, 1972, and certain foreign sound recordings that were published without notice. For further information concerning restored sound recordings, see *Copyright Restoration Under the URAA* (**Circular 38B**).

---

**NOTE**

1. This circular is intended as an introduction to registering sound recordings. The authoritative source for U.S. copyright law is the Copyright Act, codified in Title 17 of the *United States Code*. Copyright Office regulations are codified in Title 37 of the *Code of Federal Regulations*. Copyright Office practices and procedures are summarized in the third edition of the *Compendium of U.S. Copyright Office Practices*, cited as the *Compendium*. The copyright law, regulations, and the *Compendium* are available on the Copyright Office website at **www.copyright.gov**.

## For Further Information

### By Internet

The copyright law, the *Compendium*, electronic registration, application forms, regulations, and related materials are available on the Copyright Office website at **www.copyright.gov**.

### By Email

To send an email inquiry, click the *Contact Us* link on the Copyright Office website.

### By Telephone

For general information, call the Copyright Public Information Office at (202) 707-3000 or 1-877-476-0778 (toll free). Staff members are on duty from 8:30 am to 5:00 pm, eastern time, Monday through Friday, except federal holidays. To request application forms or circulars by postal mail, call (202) 707-9100 or 1-877-476-0778 and leave a recorded message.

### By Regular Mail

Write to

    Library of Congress

    U.S. Copyright Office

    Publications Section

    101 Independence Avenue, SE #6304

    Washington, DC 20559-6304



SINCE 1828

Non-stop flights to Hawaii   Book Now   HAWAIIAN AIRLINES.

# quality *noun*

qual·i·ty  |  \ˈkwä-lə-tē   \

*plural* **qualities**

## Definition of *quality* (Entry 1 of 2)

**1**   **a**   : peculiar and essential character **:** NATURE
// her ethereal *quality*
— Gay Talese

**b**   : an inherent feature **:** PROPERTY
// had a *quality* of stridence, dissonance
— Roald Dahl

**c**   : CAPACITY, ROLE
// in the *quality* of reader and companion
— Joseph Conrad

**2**   **a**   : degree of excellence **:** GRADE
// the *quality* of competing air service
— *Current Biography*

**b**   : superiority in kind
// merchandise of *quality*

cited in ABC Entertainment Inc. v. CBS Corp., No. 16-55917 archived on October 26, 2018

LEARN MORE FROM M-W



9 Useful Words

**4  a** : a distinguishing attribute : CHARACTERISTIC

*II* possesses many fine *qualities*

**b** *archaic* : an acquired skill : ACCOMPLISHMENT

**5** : the character in a logical proposition of being affirmative or negative

**6** : vividness of hue

**7  a** : TIMBRE

**b** : the identifying character of a vowel sound determined chiefly by the resonance of the vocal chambers in uttering it

**8** : the attribute of an elementary sensation that makes it fundamentally unlike any other sensation

# quality  adjective

## Definition of *quality* (Entry 2 of 2)

: being of high quality

cited in ABS Entertainment Inc. v. CBS Corp., No. 16-55917 archived on October 26, 2018

**Synonyms & Antonyms**

**Choose the Right Synonym**

**More Example Sentences**

**Learn More about *quality***

*Keep scrolling for more*

## Synonyms & Antonyms for *quality*

### Synonyms: Noun

attribute, attribution, character, characteristic, criterion, differentia, feature, fingerprint, hallmark, mark, marker, note, particularity, peculiarity, point, property, specific, stamp, touch, trait

### Synonyms: Adjective

A-OK, A1, awesome, bang-up, banner, beautiful, blue-chip, blue-ribbon, brave, bully, bumper, capital, choice, classic, cool *[slang]*, corking, crackerjack, dandy, divine, dynamite, excellent, fab, fabulous, famous, fantastic, fine, first-class, first-rate, first-string, five-star, four-star, frontline, gilt-edged *(or* gilt-edge*)*, grand, great, groovy, heavenly, high-class, hot, immense, jim-dandy, lovely, marvelous *(or* marvellous*)*, mean, neat, nifty, noble, par excellence, peachy, prime, prize, prizewinning, sensational, splendid, stellar, sterling, superb, superior, superlative, supernal, swell, terrific, tip-top, top, top-notch, top-of-the-line, topflight, unsurpassed, wonderful

### Antonyms: Adjective

atrocious, awful, execrable, lousy, pathetic, poor, rotten, terrible, vile, wretched

## Choose the Right Synonym for *quality*

### Noun

QUALITY, PROPERTY, CHARACTER, ATTRIBUTE mean an intelligible which a thing may be identified. QUALITY is a general term applicable t characteristic whether individual or generic. *//* material with a silky *qualit* PROPERTY implies a characteristic that belongs to a thing's essential n be used to describe a type or species. *//* the *property* of not conducting CHARACTER applies to a peculiar and distinctive quality of a thing or a remarks of an unseemly *character //* ATTRIBUTE implies a quality ascri or a being. *//* the *attributes* of a military hero *//*



## Examples of *quality* in a Sentence

### Noun

// Honesty is a desirable *quality*.

// Stubbornness is one of his bad *qualities*.

cited in ABS Entertainment Inc. v. CBS Corp., No. 16-55917 archived on October 26, 2018

### Recent Examples on the Web: Noun

// But as the path to the pros through the academies becomes well trave
a player's pre-teen years, the *quality* of the national team will jump as a
— Rich Campbell, *chicagotribune.com*, "Missing World Cup can't be in vain for U
national team," 13 July 2018

// Net The *quality* of the grasp depends on a few things.
— Matt Simon, *WIRED*, "Robots Can't Hold Stuff Very Well. But You Can Help,"

These example sentences are selected automatically from various online news sources to reflect cu
word 'quality.' Views expressed in the examples do not represent the opinion of Merriam-Webster o
feedback.





ScholarShare
529

## First Known Use of *quality*

### Noun

14th century, in the meaning defined at sense 1a

### Adjective

1936, in the meaning defined above

## History and Etymology for *quality*

### Noun

Middle English *qualite*, from Anglo-French *qualité*, from Latin *qualitat-, qualitas*, from *qualis* of what kind; akin to Latin *qui* who — more at WHO

cited in ABS Entertainment Inc. v. CBS Corp., No. 16-55917 archived on October 26, 2018

*Keep scrolling for more*

## Learn More about *quality*

Share *quality*

Resources for *quality*

## From the Editors at Merriam-Webster



The Adverb: A Most Fascinating POS

### Dictionary Entries near *quality*

qualitative analysis

qualitative character

qualitied

**quality**

quality assurance

quality circle

quality control

### Phrases Related to *quality*

quality of life

quality time

star quality

### St

**La**

10

**Lo**

To

*Keep scrolling for more*

# More Definitions for *quality*

## quality  noun

**English Language Learners Definition of *quality* (Entry 1 of 2)**

: how good or bad something is

: a characteristic or feature that someone or something has : something that can be noticed as a part of a person or thing

: a high level of value or excellence

## quality  adjective

**English Language Learners Definition of *quality* (Entry 2 of 2)**

: very good or excellent

: intended for people who are educated and who care about serious matters

See the full definition for *quality* in the English Language Learners Dictionary

## quality  noun

qual·i·ty  |  \ˈkwä-lə-tē  \

*plural* **qualities**

### Kids Definition of *quality* (Entry 1 of 2)

**1**  : what sets a person or thing apart : CHARACTERISTIC
   // We must advertise Wilbur's noble *qualities* …

cited ABS Entertainment Inc. v. CBS Corp., No. 16-55917 archived on October 26, 2018

— E. B. White, *Charlotte's Web*

**2**    **:** how good or bad something is
// The food is of excellent *quality*.

**3**    **:** a high standard **:** EXCELLENCE
// His skill shows in the *quality* of his work.

# quality  adjective

## Kids Definition of *quality* (Entry 2 of 2)

**:** very good **:** EXCELLENT
// *quality* work
// *quality* chocolate

# quality  noun

qual·i·ty   |   \ˈkwäl-ət-ē     \
*plural* **qualities**

## Medical Definition of *quality*

**:** a special or distinguishing attribute: as

 **:** TIMBRE

 **:** the attribute of an elementary sensation that makes it fundamentally unlike any other sensation

 **:** the character of an X-ray beam that determines its penetrating power and is dependent upon its wavelength distribution

Credit: ABS Entertainment Inc. v. CBS Corp., No. 16-55917 archived on October 26, 2018

*Keep scrolling for more*

# quality  noun

qual·i·ty

*plural* **qualities**

## Legal Definition of *quality*

**1**  : a special, distinctive, or essential character

    **a**  : a character, position, or role assumed

      *//* those acts of ownership, which the person called to the succession can only do in his *quality* of heir

      — *Louisiana Civil Code*

    **b**  : the character of an estate as determined by the manner in which it is to be held or enjoyed

**2**  : degree of excellence

    *//* made no warranties as to the product's *quality*

*Keep scrolling for more*

cited in CBS Entertainment Inc. v. CBS Corp., No. 16cv55917 archived on October 26, 2018

## More from Merriam-Webster on *quality*

See words that rhyme with *quality*

Thesaurus: All synonyms and antonyms for *quality*

Spanish Central: Translation of *quality*

Nglish: Translation of *quality* for Spanish Speakers

Britannica English: Translation of *quality* for Arabic Speakers

## Comments on *quality*

What made you want to look up *quality*? Please tell us where you read or heard it (including the quote, if possible).

## Love words? Need even more definitions?

Subscribe to America's largest dictionary and get thousands more definitions and advanced search—ad free!

MERRIAM-WEBSTER UNABRIDGED

### WORDS AT PLAY

cited in ABS Entertainment Inc. v. CBS Corp., No. 16-55917 archived on October 26, 2018

SPANISH CENTRAL

LEARNER'S ESL DICTIONARY

WORDCENTRAL FOR KIDS

VISUAL DICTIONARY

SCRABBLE® WORD FINDER

MERRIAM-WEBSTER'S UNABRIDGED DICTIONARY

BRITANNICA ENGLISH - ARABIC TRANSLATION

NGLISH - SPANISH-ENGLISH TRANSLATION

FOLLOW US

  

cited in ABS Entertainment Inc., v. CBS Corp., No. 16-55917 archived on October 26, 2018

Browse the Dictionary:   A  B  C  D  E  F  G  H  I  J  K  L  M  N  O  P  Q  R  S  T  U  V  W  X  Y  Z   0-9

Home  Help  |  Apps  |  About Us  |  Shop  |  Advertising Info  |  Dictionary API  |  Contact Us  |  The Open Dictionary  |  Word of the Year  |  We're Hiring  |  Law Dictionary  |  Medical Dictionary  |  Privacy Policy  |  Terms of Use

Browse the Thesaurus  |  Browse the Medical Dictionary  |  Browse the Legal Dictionary  |  Browse the Spanish-English Dictionary

© 2018 Merriam-Webster, Incorporated